WHITE, ADMR., APPELLANT, *v.* MOODY ET AL., APPELLEES.

(No. 86AP-1097—Decided June 28, 1988.)

*Arnold S. White,* pro se.
*Crabbe, Brown, Jones, Potts & Schmidt* and *Gilbert J. Gradisar,* for appellee Eleanor Roberts; *William L. Schmidt,* for appellee Mary Nolze.

BOWMAN, J. This is an appeal from the judgment of the Franklin County Court of Common Pleas after a jury determination that appellees Eleanor Roberts and Mary Nolze were negligent in their nursing care of the deceased, Noble Jackson, and that Jackson was contributorily negligent in causing her own death.

Appellant, Arnold White, as administrator of Noble Jackson's estate, brought this action as a result of Jackson's death. On May 15, 1979, Jackson, a twenty-one-year-old female,

was incarcerated at the Women's Correctional Facility ("WCI") located in Columbus, Ohio, and operated by the city of Columbus. Jackson had been arrested in Columbus on a charge of aggravated trafficking of an illegal substance and was incarcerated while awaiting trial. On June 3, 1979, Jackson was removed by ambulance from WCI and taken to a hospital where she died on June 4, 1979 of cardiopulmonary arrest caused by choriocarcinoma of her uterus, a type of cancer, which spread into her uterine veins and arteries and metastasized to her lungs, spleen and brain. Jackson had delivered a stillborn baby at home on April 17, 1979.

Appellant, as administrator of Jackson's estate, brought suit against the city of Columbus, WCI's superintendent, various other city officials, and the WCI doctor in 1979 for Jackson's wrongful death and a survivorship action. In 1980, appellant added, as defendants, appellees, who were nurses employed at WCI while Jackson was confined there. The city of Columbus, city officials, the WCI superintendent and the WCI doctor eventually settled with appellant or were otherwise dismissed as parties, leaving appellees to be tried on the complaint. Appellant requested compensatory damages, funeral expenses and punitive damages for Jackson's beneficiaries for her wrongful death, and appellant requested compensatory damages, damages for pain and suffering and punitive damages for Jackson's survival claim. Appellant additionally requested attorney fees and costs. Appellant demanded that all of these damages be paid by the appellees jointly and severally.

The trial was held beginning on August 28, 1986. Roberts and Nolze testified extensively as to their nursing practices at WCI and their treatment of Jackson during her incarceration at WCI. Appellees testified that at "pill call" Jackson had requested aspirin thirteen times and an antacid once during her seventeen-day incarceration. Both appellees admitted that they never asked Jackson why she wanted the aspirin, although they recalled that at some time she stated she had a headache. Appellees testified that the prisoners at WCI lined up during "pill call" and requested nonprescription medications such as aspirin, antacid, or a laxative. Appellees also said that many of the inmates would attend "pill call" only for something to do. The "pill call" records entered into evidence and appellees' testimony revealed that generally there was no record explaining why the inmates wanted the nonprescription drug, as in Jackson's situation.

Appellees also testified that Jackson had requested a lower bunk on her arrival at WCI. Roberts, who worked the first shift, testified that, when a guard told her that Jackson wanted a lower bunk, she told the guard to tell Jackson that only the WCI doctor could assign lower bunks. Nolze testified that later Jackson asked Nolze, who worked second shift, for a lower bunk. Nolze said that when she asked Jackson why she wanted a lower bunk Jackson told her that she had delivered a baby at a hospital in Columbus. Nolze said she called the labor and delivery ward at the hospital where Jackson said she had delivered a baby and the hospital employee informed Nolze that there was no record of Jackson delivering a baby there. Nolze testified further that Jackson then told her that she had actually delivered her baby at home. Nolze said that Jackson did not tell her that the baby was stillborn or that Jackson had subsequently gone to the hospital for fainting and hemorrhaging on May 5, 1979, ten days before her incarceration at WCI. Jackson was placed on the "sick call" list to

see the WCI doctor on June 1, 1979 to request a bottom bunk.

On May 28, 1979, appellees testified that Jackson complained of feeling ill and appellees placed her in the cell block used for both medical observation and to punish inmates, as WCI did not have an infirmary. Roberts testified that the nurses' office and infirmary were across the street from WCI where the administration building and men's incarceration area were located. The women inmates stayed in a dormitory next to the cell block. The records indicate that Jackson was released from the cell block "per nurse"; however, neither of the appellees recalled releasing her.

Other women who were inmates at WCI, while Jackson was incarcerated there, testified that Jackson told them she was spitting up blood, had headaches and abdominal pains, her side hurt, and she had just had a baby. These former WCI inmates also said that Jackson could barely get up and down from her top bunk and that WCI continued to have Jackson do her clean-up duties. Jackson also told these inmates that no one at WCI would believe that she was sick. A few former WCI inmates stated that Roberts told other WCI employees that Jackson was faking illness.

One former WCI inmate testified that Roberts was called into the restroom when Jackson spit up blood in the sink and Roberts told Jackson that there was not enough blood to be significant and to inform her when Jackson really spit up a substantial amount of blood. Another former inmate testified that Jackson had spit up blood into her own hand at "pill call" to show one of the appellees. However, appellees stated at trial that they never knew Jackson was spitting up blood.

The WCI's social worker also testified that Jackson told her that she had complained to the WCI nurse that she had been spitting up blood and the nurse said she probably only had the twenty-four-hour flu. The social worker told Jackson to put her complaint in writing and the social worker would give it to WCI's superintendent. Jackson, however, told the social worker that she was afraid of being placed in the cell block and she never put her complaint in writing. The social worker did not talk to appellees regarding Jackson because she said the social workers had been told not to interfere in medical matters at WCI.

Jackson saw the WCI doctor at sick call on Friday, June 1, 1979. Roberts, who was present at sick call, did not tell the doctor about Jackson's request for aspirin or headaches. Roberts did not tell the doctor that Jackson had been placed in the cell block on May 28, 1979 because she was ill. The WCI doctor only had a card that had been completed by Nolze that said Jackson claimed she was six weeks postpartum. The word "claims" was underlined. Jackson also did not tell the WCI doctor that she was spitting up blood, having headaches and abdominal pain. Jackson apparently only told the doctor that she had a yellow vaginal discharge. The doctor did not give Jackson a bottom bunk, but he did prescribe a suppository. He did not perform a physical examination.

That Friday afternoon, after seeing the doctor, Jackson fainted in the WCI recreational room. When the guard called Roberts to inform her, she said she told the guards to remove Jackson to the cell block. The WCI social worker testified that the WCI superintendent had to call Roberts to request that she come to the cell block to examine Jackson.

Roberts testified that she did not take any equipment to the cell block to examine Jackson, other than the stethoscope that she always carried.

Roberts said she examined Jackson while Jackson was lying on the floor of the cell on her left side. Roberts stated that Jackson told her that her left side was paralyzed. Roberts looked in Jackson's eyes to see if the pupils were equally sized and whether the eyelids drooped. Testimony indicated that there was limited light in the cell. Roberts testified that she passed an ammonia inhalant under Jackson's nose to revive her when Jackson stopped speaking to her, although Roberts had recorded that she used the inhalant to test for paralysis. Roberts testified further that she began to close the cell door on Jackson's left leg because Roberts thought that the cold door would cause Jackson to flinch if she was not paralyzed. Roberts said the guard stopped her from closing the door on Jackson's leg. Roberts then directed the guard to leave Jackson in the cell for observation.

Two former WCI inmates, who had delivered Jackson's meals to her in the cell block, testified as to Jackson's worsening condition over the weekend of Saturday, June 3 to Sunday, June 4, 1979. These inmates testified that Jackson, who was lying on the floor of a cell on a mattress, moved very little during the entire weekend and she did not eat anything. They said that Jackson was not allowed to have visitors and that Nolze would not come into the cell to give Jackson an aspirin, but told Jackson that she had to get up and get the aspirin herself. A former inmate who was placed in the cell with Jackson on Saturday testified that, at that point, Jackson had no clothes on and this inmate, who was also ill, had to help Jackson to the toilet in the cell because no one would aid Jackson. Nolze, who was on duty Friday night and Saturday until the middle of the afternoon, said she never went into the cell to assess Jackson's condition.

These former inmates testified that by Sunday, Jackson's skin looked ashy colored and her eyes were protruding slightly. Jackson asked the inmates who brought her meals to obtain her Bible and a gown and to call her mother, who lived in Columbus, to tell her that Jackson was very ill. Pursuant to WCI rules, the inmates were not allowed to bring anything to a person placed in the cell block. However, these inmates asked an inmate who was being incarcerated only for the weekend to phone Jackson's mother on Sunday night. After being contacted by this inmate, Jackson's mother said she called WCI several times on Sunday night, and she was told that Jackson was alright but she could not see her. Finally, the last time Jackson's mother phoned WCI, she was told her daughter had been taken to the hospital.

Roberts stated at trial that a guard called her Sunday night, June 3, 1979, and said that Jackson was foaming at the mouth and not responding. There was never a nurse on duty on Saturday night or Sunday at WCI. Roberts told the guard to call the emergency squad and have Jackson transported to the hospital.

The paramedics, who transported Jackson to the hospital, testified that when they arrived at WCI they found Jackson nude in a cell with blood and saliva coming from her mouth and no vital signs. One paramedic testified that he was handed one sheet of paper regarding her medical condition which stated that she was a possible drug user. After performing CPR and treating Jackson with drugs, the paramedics testified that they were able to artificially maintain her life and she was transported to the hospital. Jackson never regained consciousness and died the next day, June 4, 1979.

The pathologist testified that Jackson died of cardiopulmonary arrest due to choriocarcinoma, or cancer, of the uterus which spread to the uterine

veins and arteries and metastasized to the lungs, spleen and brain. The pathologist testified that a tumor had developed in Jackson's uterus after she had a stillborn baby. He said that the complications from, and spread of, this disease would have caused her to spit up blood and caused her brain to swell. He testified that the swelling of Jackson's brain would have caused headaches and eventually made her involuntary muscles nonfunctional, leading to paralysis and her heart attack. The pathologist said he found no evidence of a drug overdose.

In addition to the pathologist, several expert witnesses also testified. The expert testimony showed that, if Jackson's choriocarcinoma had been treated properly while she was imprisoned at WCI, she would have had a very good chance of survival.

Two nurses testified regarding nursing care. A nurse who worked at an Ohio prison testified for appellees. This nurse said that inmates often lie about being ill. A professor of nursing who had some nursing experience in a prison testified for appellant. This nurse testified that the records kept by appellees were not thorough, that the appellees should have informed the WCI doctor of Jackson's headaches, and that spitting up any amount of blood was a significant symptom which should have been reported to a doctor so that tests could be performed and that aspirin should not have been given to Jackson, or to any patient, on such a continuing basis.

This nurse also testified that when Jackson fainted, Roberts should have examined Jackson where she fainted instead of having her moved; that Roberts needed to shine a small light in Jackson's eyes to determine eye response; that Jackson should have been lying on her back to be examined by Roberts in the cell; and that Roberts needed to perform other tests on Jackson when she fainted which would have taken approximately ten minutes. She stated that closing the cell door on Jackson's leg and waving an ammonia inhalant under her nose was not a proper test for paralysis and probably would have scared Jackson. In addition, this nurse stated that Nolze should have examined Jackson when she was in the cell over the weekend. She also said that leaving Jackson unattended in a dark cell would have frightened her.

Finally, many of Jackson's family members, including her minor son, testified regarding Jackson's relationship to them, her education and work experience.

After closing arguments, the trial judge instructed the jury on negligence and reckless infliction of emotional distress. The trial judge also instructed on contributory negligence as appellees requested. Appellant's request for instructions on punitive damages, assault, and attorney fees and costs was denied. Appellant also objected to the trial court's combining of the beneficiaries' wrongful death claim and Jackson's survival claim on one interrogatory form for each party.

The jury found that Jackson was forty-nine percent contributorily negligent; of the remaining fifty-one percent, the jury found that Roberts was sixty-five percent negligent and Nolze was thirty-five percent negligent. The jury awarded damages in the amount of fifty-one percent of $85,000. Appellees moved to offset the award against the contributions of the other defendants who had settled and the motion was granted. Appellant's motion for a judgment notwithstanding the verdict, a new trial or an additur was overruled.

Appellant has timely appealed the judgment of the trial court and asserts the following assignments of error:

"I. The court erred in reversing

previously announced instructions and verdict forms after final argument, in violation of R.C. 2315.01.

"II. The court erred in refusing to instruct on punitive damages.

"III. The court erred in not providing separate jury forms for wrongful death and for survival claims.

"IV. The court erred in refusing to allow the deposition of Guard Mason.

"V. The court erred in allowing the defendants to introduce the deposition of a doctor not on defendants' pretrial witness list and not taken by any of the parties to the trial.

"VI. The court erred in instructing on contributory negligence, and a finding that Noble was 49% negligent was against the manifest weight of the evidence."

Appellant claims, in the first assignment of error, that the trial court erred by changing its decision to give a punitive damage instruction and changing its decision to give the jury separate verdict forms for the wrongful death claim and the survival claim. Appellant claims that this prejudiced appellant because the trial judge made this decision after final arguments in which appellant had advocated and explained punitive damages and had also shown the jury charts explaining the separate verdict forms. Appellant states that before final arguments, the trial judge, while in chambers, agreed to give a punitive damage instruction and to give the jury separate verdict forms for each claim. The discussion in the judge's chamber was not recorded and there is no indication in the record that the trial judge originally told the parties' attorneys before final arguments that he would give a punitive damage instruction and that he would give the jury separate verdict forms for the wrongful death claim and the survival claim. Because there is no record that the trial judge changed his decision on these matters after final argument, we must overrule appellant's first assignment of error.

In his second assignment of error, appellant contends that the evidence warranted that the trial judge instruct the jury regarding punitive damages. When the question of punitive damages should be submitted to a jury was discussed by the Supreme Court of Ohio in *Smithhisler* v. *Dutter* (1952), 157 Ohio St. 454, 47 O.O. 334, 105 N.E. 2d 868, in which the Supreme Court stated:

"'This court has, over the years, recognized the propriety of submitting to a jury the question of the assessment of punitive damages in certain tort cases where the defendant's wrongdoing has been intentional and deliberate, or has the character of outrage frequently associated with crime.

" 'Not all tort actions are of such a character as to warrant the assessment of punitive damages. Generally the application of the doctrine is confined to cases where there is involved actual malice * * * or wanton personal injury * * *.' " *Id.* at 461, 47 O.O. at 337, 105 N.E. 2d at 872, citing the dissent's definition in *Saberton* v. *Greenwald* (1946), 146 Ohio St. 414, 437, 32 O.O. 454, 463, 66 N.E. 2d 224, 234; also recited in *Gearhart* v. *Angeloff* (1969), 17 Ohio App. 2d 143, 144, 46 O.O. 2d 207, 208, 244 N.E. 2d 802, 804.

Evidence of actual malice is required before a jury question of punitive damages is raised. Actual malice was defined in *Pickle* v. *Swinehart* (1960), 170 Ohio St. 441, 443, 11 O.O. 2d 199, 200, 166 N.E. 2d 227, 229, as "* * * that state of mind under which a person's conduct is characterized by hatred or ill will, a spirit of revenge, retaliation, or a determination to vent his feelings upon other per-

sons. * * *'' As recognized by the Supreme Court of Ohio in *Detling* v. *Chockley* (1982), 70 Ohio St. 2d 134, 137, 24 O.O. 3d 239, 241, 436 N.E. 2d 208, 210, it is rarely possible to prove actual malice other than by conduct and surrounding circumstances. As the court stated, "* * * [o]ne who has committed an act would scarcely admit that he was malicious about it, and so, necessarily, malice can be inferred from conduct. * * *" *Id.*

In the present case, there is evidence from which a jury could find actual malice by appellees, either from the appellees' admission that they failed to inform the WCI physician of the numerous times that Jackson requested aspirin or that Jackson had been placed in a cell block, also used for punishment, due to illness. Roberts also admits that she attempted to close a cell door on Jackson's leg. A jury may or may not believe Roberts' explanation that this was done only to check for paralysis.

According to the testimony of several former WCI inmates, appellees acted in other instances in such a way that a jury might find actual malice. Former inmates' testimony, if believed by the jury, indicated that appellees knew that Jackson was spitting up blood and that they saw her spit up blood, yet they ignored the problem and did not provide appropriate medical treatment. The testimony concerning the treatment Jackson received in her cell during her last few days of life might also cause the jury to infer the presence of actual malice by appellees. Not allowing Jackson assistance while she was in the cell block to obtain aspirin or to get to the toilet might warrant the jury to find actual malice. The lack of medical treatment that Nolze provided while Jackson was in the cell block may also cause an inference of recklessness, or wanton or willful conduct. Thus,

because the evidence presented to the jury was such that a jury might infer actual malice by appellees, the trial judge should have instructed the jury on punitive damages to allow the jury to determine whether punitive damages should be granted to appellant on either claim.

Appellees contend, however, that the appellant did not object to the failure of the trial judge to instruct the jury on punitive damages before the jury retired to deliberate, pursuant to Civ. R. 51(A). The rule requires objection be made out of the presence of the jury.

The record shows the trial court interrupted the jury charge and retired the jury to await completion of the verdict forms and interrogatories. The court then continued to instruct the jury on completion of the verdict forms and interrogatories and retired the jury without providing an opportunity on objections to be made outside the hearing of the jury. At that time, the jury still had not been given the exhibits or verdict forms. About thirty minutes later the jury was recessed for lunch.

At this time, appellant requested the court to put on the record any objections counsel had to the jury instructions. Appellant then objected to the failure of the court to instruct on punitive damages and to provide separate interrogatories for each cause of action, *i.e.,* wrongful death and appellant's survivorship claim. Nolze's attorney and Roberts' attorney also stated their objections at this time. No assertion was made by any party that the objections were untimely. The court also did not admonish the counsel that the objections were untimely and overruled all objections. While it is counsel's obligation to make timely objections to the jury charge before the jury retires, whether or not the court provides the opportunity to do so,

based on the record we find in this instance the time at which appellant objected to the court's instruction to the jury was acquiesced to by the parties and the court, and such objections were timely pursuant to Civ. R. 51(A).

Appellant also argues that, because the jury should have been allowed to consider punitive damages, an instruction on the payment by appellees of appellant's attorney fees and costs should have also been given.

In tort actions involving fraud, malice or insult, and in which punitive damages are assessed, a jury may consider awarding counsel fees and the costs of litigation. See *Smithhisler, supra,* and *Langhorst* v. *Riethmiller* (1977), 52 Ohio App. 2d 137, 6 O.O. 3d 101, 368 N.E. 2d 328. Since we have determined that there was evidence from which a jury could find malice and that a punitive damage instruction should have been given, instructing the jury concerning appellant's right to recover attorney fees and the costs of litigation was also proper.

In addition, appellant asserts that the trial judge should have granted appellant prejudgment interest because the appellees were ultimately found to be negligent and they had never offered any amount in settlement before trial.

Effective July 5, 1982, R.C. 1343.03(C) provides:

"Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid, if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."

Thus, an award of prejudgment interest is discretionary with the court to be awarded upon motion after the verdict. Prejudgment interest after the 1982 amendment to R.C. 1343.03(C) is not an item of damage to be considered by the trier of fact. *Cox* v. *Fisher Fazio Foods, Inc.* (1984), 13 Ohio App. 3d 336, 13 OBR 414, 469 N.E. 2d 1055.

Appellant also attempts to raise, by way of a footnote in his second assignment of error, an argument concerning the refusal of the trial court to instruct the jury on assault. Because raising an assignment of error by discussing it in a footnote is improper, we will not consider this matter on appeal. App. R. 16(A)(2).

However, since there was evidence in this case from which a jury might find malice on the part of appellees, this court sustains appellant's second assignment of error and finds that the trial court should have given jury instructions on appellant's right to recover punitive damages, attorney fees and litigation costs.

Appellant alleges, in the third assignment of error, that the trial court erred by not providing separate jury verdict forms for the wrongful death claim and the survival claim. It appears that the trial court provided the jury with three separate interrogatory forms, one form per party, on which the jury was to indicate whether that party was negligent in causing Jackson's death, and if found to be negligent, the percent of that party's negligence and the amount of damages due. With each interrogatory form, there was also a verdict form for each party. The jury was instructed to decide upon the total amount of damages that appellant sustained and then to apportion this amount among the parties according to each party's percentage of fault.

An action for wrongful death, pursuant to R.C. 2125.01, although brought in the name of the decedent's personal representative, is for "* * * the exclusive benefit of the surviving spouse, the children, and * * * other next of kin of the decedent." R.C. 2125.02. The purpose of the action is to compensate a decedent's beneficiaries for pecuniary loss resulting from the death and to provide payment of funeral expenses. *Karr* v. *Sixt* (1946), 146 Ohio St. 527, 32 O.O. 14, 67 N.E. 2d 331. On the other hand, a survivor action, while brought on behalf of the estate also by the administrator of the decedent's estate, is not concerned with damages suffered by the beneficiaries, but, rather, is a cause of action which the decedent would have had for personal injury, pain and suffering. *Hillard* v. *Western & Southern Life Ins. Co.* (1941), 68 Ohio App. 426, 23 O.O. 133, 34 N.E. 2d 75. While the same act may give rise to both claims, the causes of action are separate and distinct and are intended to accomplish very different purposes. While both claims were brought in appellant's name as the decedent's personal representative, there were, in essence, two plaintiffs in this case seeking recovery for two separate, although related, causes of action.

We agree that it was error by the trial court not to submit separate verdict forms and interrogatories for the wrongful death and survivorship claims; however, appellant failed to object to the form of the jury verdict and only objected to the form of the interrogatories and has therefore waived any objection as to the verdict form. However, given our disposition of appellant's second assignment of error and the necessity of a retrial, we decline to consider whether this amounted to plain error. Appellant's third assignment of error is overruled.

Appellant's fourth and fifth assignments of error both concern the admission of certain witnesses' depositions at trial. The admission of a deposition at trial in substitution for calling the witness to testify in person is controlled by Civ. R. 32(A), which states in part:

"At the trial or upon the hearing of a motion or an interlocutory proceeding, any part or all of a deposition, so far as admissible under the rules of evidence applied as though the witness were then present and testifying, may be used against any party who was present or represented at the taking of the deposition or who had reasonable notice thereof * * *."

In appellant's fourth assignment of error, appellant asserts that the deposition of Dorothy Mason, a guard at WCI during Jackson's incarceration, should have been allowed into evidence when the guard would not appear to testify at trial after being subpoenaed and served with an order to show cause for her nonappearance. Appellees, however, objected to the admission of the Mason deposition because neither appellee was a party to the case when the WCI guard's deposition was taken, and thus, appellees were not represented at the deposition. Appellant counters the objection by contending that the city attorney who was present at the deposition can also be inferred to represent appellees who were city employees.

Appellant's contentions regarding the admission of Mason's deposition are not well-taken. Civ. R. 32(A) specifically requires that a party has to either be present or represented at the deposition or have notice of the deposition in order for a deposition to be admitted at trial. Appellees were not even parties to this case at the time of Mason's deposition; thus, they clearly had no reason to be represented or present at the deposition, nor did they have legal notice of the deposition. The

city attorney was present at Mason's deposition only to represent the interest of the city and those city employees who had already been named as parties to the litigation. Therefore, appellant's fourth assignment of error is overruled.

In appellant's fifth assignment of error, appellant claims that the trial court erred by allowing into evidence the deposition of an expert witness, Dr. Charles Hammond, a medical professor at Duke University. Appellant claims that the trial court erred in admitting this doctor's deposition because appellees had not retained Dr. Hammond as an expert witness, but, rather, that he was retained as the expert witness of the WCI doctor who had settled with appellant and been dismissed as a party. Furthermore, appellant asserts that Dr. Hammond was not listed to be called as a witness on appellees' pretrial list of witnesses. Appellees claim that they had also retained Dr. Hammond as an expert witness. Appellant was notified of Dr. Hammond's deposition and was represented by counsel at the deposition.

It is unclear from the record whether appellees retained Dr. Hammond to testify on their behalf or whether he was solely retained by the WCI doctor. However, Civ. R. 32 (A) only requires that the party against whom the deposition is to be used be notified of or present or represented at the deposition. Appellant was notified of Dr. Hammond's deposition, was represented at the deposition, and appellant cross-examined Dr. Hammond at the deposition.

Appellant also contends that, because appellees did not list Dr. Hammond as an expert witness in their pretrial statement, appellees were precluded from having Dr. Hammond's deposition admitted as evidence, pursuant to Loc. R. 31.04 of the Court of Common Pleas of Franklin County, which requires that a party list the witnesses that he plans to have testify at trial. The rule states that "* * * [n]o further additions to the proposed list of witnesses and exhibits will be permitted without good cause shown and the permission of the trial judge." In this case, the trial judge extensively questioned the attorneys outside the hearing of the jury concerning Dr. Hammond's deposition, called a recess so that he could consider whether this deposition should be admitted and specifically stated that it was admissible pursuant to Civ. R. 32, and thus there was compliance with the local court rule. Appellant's fifth assignment of error is overruled.

Appellant, in the sixth assignment of error, contends that the trial judge erred in instructing the jury on contributory negligence because there was no evidence that Jackson was negligent in causing her own death, and that the jury's finding that Jackson was forty-nine percent negligent was against the manifest weight of the evidence. The testimony, however, shows that there was some evidence from which a jury could infer that Jackson's omissions may have contributed to causing her death. Jackson did not tell the WCI doctor that she had been treated at a hospital for hemorrhaging and fainting following delivery of a stillborn infant shortly before she was incarcerated at WCI, nor did she tell the WCI doctor that she had been spitting up blood. According to her family's testimony, she did not discuss all of her symptoms with them when they came to visit her during her early incarceration at WCI. Her family stated that she also never telephoned her mother or any other family member at times when she would have been able to discuss her medical problems with them. The WCI social worker asked Jackson to write

down her medical complaint so that the social worker could give the written complaint to the WCI superintendent. Jackson never wrote down the complaint. Furthermore, appellees' testimony indicated that Jackson may not have told appellees some of her important symptoms and previous medical history.

Because there is some evidence from which a jury might infer that Jackson was contributorily negligent, the trial court was correct in instructing the jury on contributory negligence. However, since this cause is to be remanded for a new trial, the percentage of Jackson's contributory negligence will have to again be determined. Appellant's sixth assignment of error is overruled.

For the foregoing reasons, appellant's first, third, fourth, fifth and sixth assignments of error are overruled and appellant's second assignment of error is sustained. The judgment of the Franklin County Court of Common Pleas is reversed and this cause is remanded for a new trial to be held in accordance with this opinion.

*Judgment reversed and cause remanded.*

REILLY and BRYANT, JJ., concur.