JOYCE–COUCH, Appellant,

v.

DeSILVA et al., Appellees.

[Cite as *Joyce–Couch v. DeSilva* (1991), 77 Ohio App.3d 278.]

Court of Appeals of Ohio,
Clermont County.

No. CA90–06–051.

Decided Sept. 23, 1991.

280

*Margaret Dobrozsi Hand; DeCenso & Knapp* and *William C. Knapp,* for appellant.

*Lindhorst & Dreidame* and *Stephen A. Bailey,* for appellees Bernard DeSilva, M.D. and Medical Practice Assoc., Inc.

*Kohnen, Patton & Hunt* and *James A. Hunt,* for appellee The Christ Hospital.

KOEHLER, Judge.

On May 26, 1988, plaintiff-appellant, Kathleen Joyce–Couch, filed a complaint against defendants-appellees, Bernard DeSilva, M.D., Medical Practice Associates, Inc. ("MPA") and Elizabeth Gamble Deaconess Home Associates, d.b.a. The Christ Hospital ("Christ Hospital"). In her complaint, appellant sought compensatory damages for negligence and intentional infliction of

emotional distress against all three defendants and punitive damages against DeSilva and MPA.

A jury trial was held on January 4–19, 1990. The trial court granted DeSilva's motion for a directed verdict on the issue of punitive damages, but submitted all other issues to the jury. The jury entered a general verdict in favor of Christ Hospital but against DeSilva and MPA. It awarded appellant $125,000 compensatory damages; however, it determined that DeSilva and MPA were sixty percent negligent and appellant was forty percent negligent. Subsequently, the trial court entered judgment in favor of appellant for $75,000. Appellant filed a timely appeal from this judgment.

At trial, appellant presented evidence that she suffered physical and emotional abuse as a child at the hands of her parents. In early 1980, she began suffering from recurrent dizziness for which her physician could find no physical explanation. Her physician suggested that she see a psychiatrist and, on April 30, 1980, she sought the help of Dr. DeSilva.

DeSilva advised appellant that her problems were caused by information she had been repressing in her subconscious. He suggested that this repressed information could be uncovered through the use of sodium pentothal interviews. Appellant's expert witnesses testified that the use of sodium pentothal interviews is an accepted form of treatment to discover repressed traumatic events hidden in a patient's subconscious. They indicated that once the repressed information has been discovered, the psychiatrist should reveal the trauma to the patient and conduct therapy to help the patient cope with the trauma. Appellant's witnesses testified that in general no more than six to twelve sodium pentothal interviews should be given to any one patient.

Appellant was hospitalized at Christ Hospital in the summer of 1980 to begin the sodium pentothal interviews. At that time, DeSilva learned through the use of the interviews that appellant had been sexually abused by her mother as a very young child. Appellant asked DeSilva what she had revealed to him under sodium pentothal. He told her that she had not yet revealed what was wrong and that the sodium pentothal interviews should be continued.

Over the next four years, DeSilva conducted between one hundred forty-one and one hundred seventy-one sodium pentothal interviews, charging appellant between $75 and $100 per interview. All of the interviews took place at Christ Hospital, most on an out patient basis. Appellant testified that she received little or no feedback from DeSilva about what she revealed in the interviews. She indicated that she asked that a nurse be present while she was sedated, but that Christ Hospital nurses almost always left her alone with DeSilva. She also testified that DeSilva instructed her to unbutton the top

button of her pants during the interviews and sometimes suggested she massage her breasts. At one time he suggested that she masturbate while under the influence of sodium pentothal.

After fifteen months of sodium pentothal interviews, appellant still did not know the source of her problems. Finally, in September 1981, DeSilva told her that she had been molested as a child but that he would not tell her by whom. He continued the interviews telling her that she had to discover for herself who molested her. Appellant testified that not knowing who abused her caused her severe distress.

Appellant's overall condition gradually deteriorated. DeSilva eventually put her on psychiatric disability for several months. Appellant testified that she was unable to work, unable to sleep, and did little but stay at her home. Eventually in 1983, she went to New York to stay with her fiance and began having psychotic episodes in which she saw visions. She saw a vision of her mother molesting her. DeSilva confirmed that she had been abused by her mother. Appellant told him that she wanted to confront her mother, an idea which DeSilva opposed. DeSilva continued the sodium pentothal interviews allegedly so that appellant could learn the details of the abuse. Meanwhile, against DeSilva's wishes, appellant did confront her mother who denied committing the abuse.

In 1984, appellant discovered that against her wishes DeSilva had given her a suggestion while she was under the influence of sodium pentothal to persuade her not to confront her mother. Appellant began to suffer apprehension about what had happened to her while she was under the influence of sodium pentothal. She and her husband eventually confronted DeSilva about the unauthorized suggestion made to her while she was under sodium pentothal. She told DeSilva that she was seeing a psychologist and was confused about the proper method of treatment. DeSilva replied that he was the only one who could help her. He also told her that he was not sure that her mother had molested her, causing appellant severe distress.

Appellant continued treatment with the psychologist, who subsequently consulted with two psychiatrists. These individuals testified at trial. They indicated that appellant had become addicted to sodium pentothal and that she suffered from post traumatic stress disorder as a result of the trauma induced by DeSilva's "treatment." They also indicated that she would need therapy for several years and that part of her problem was a distrust of therapists due to her treatment by DeSilva. Appellant's experts testified that DeSilva deviated from the applicable standard of care; one indicated that he deviated from the standard of care "times ten."

The evidence also showed that appellant smoked marijuana occasionally prior to beginning her treatment with DeSilva. She testified that her use of marijuana increased while she was being treated by DeSilva and that eventually she was smoking marijuana several times a week because it helped her to sleep. She testified that she knew it was "not good for her" but that she did not know it would inhibit her treatment. Appellant also testified that she told DeSilva about her marijuana use and asked him to give her suggestions under sodium pentothal so that she would quit. However, he did not seem very concerned about it.

DeSilva presented evidence that the number of sodium pentothal interviews was justified because the trauma was so deeply repressed in appellant's subconscious. He also presented expert testimony that appellant's distress was caused by her childhood trauma and that he had not deviated from the applicable standard of care. Christ Hospital presented testimony regarding the standard procedure used in psychiatric departments of hospitals during the time period in question and that Christ Hospital nurses and administrators had not deviated from the applicable standard of care.

█ Appellant presents six assignments of error for review. In her first assignment of error, she states that the trial court erred by refusing to permit expert testimony regarding the negligence of Christ Hospital. She argues that the trial court should have permitted her three expert witnesses to testify as to the standard of care applicable to Christ Hospital. We find this assignment of error to be well taken.

█ Evid.R. 702 provides:

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

The initial determination of whether a witness is qualified to testify as an expert and to give an opinion on a particular subject rests within the discretion of the trial court. The trial court's ruling with respect to a witness' qualification as an expert will not be reversed in the absence of an abuse of discretion. *King v. LaKamp* (1988), 50 Ohio App.3d 84, 85, 553 N.E.2d 701, 702–703; *Kitchens v. McKay* (1987), 38 Ohio App.3d 165, 168–169, 528 N.E.2d 603, 605–607.

In explaining his refusal to allow appellant's expert witnesses to testify as to Christ Hospital's negligence, the trial judge stated that " * * * the court questioned whether any of the psychiatric experts had a sufficient background in hospital administration to be able to testify as to what should have

been expected of the hospital in this matter. \* \* \* " We disagree with this reasoning.

██ Under Ohio law, any doctor licensed to practice medicine is competent to testify about medical issues. *Rouse v. Riverside Methodist Hospital* (1983), 9 Ohio App.3d 206, 212, 9 OBR 355, 361–363, 459 N.E.2d 593, 600–601. The test of admissibility is whether a particular witness offered as an expert will aid the trier of fact in the search of the truth, not whether the expert witness is the best witness on the subject. *Alexander v. Mt. Carmel Medical Center* (1978), 56 Ohio St.2d 155, 159, 10 O.O.3d 332, 334, 383 N.E.2d 564, 566–567; *Ishler v. Miller* (1978), 56 Ohio St.2d 447, 453, 10 O.O.3d 539, 542–543, 384 N.E.2d 296, 300; *King, supra,* 50 Ohio App.3d at 85, 553 N.E.2d at 702–703.

In this case, appellant's experts were psychiatrists, medical doctors, who indicated they were familiar with the operation of a psychiatric department in a hospital. It is our view that they were competent to testify as to the standard of care expected in a psychiatric hospital. We believe their testimony could be helpful to the trier of fact and any weakness in their testimony relates to its weight, not its admissibility. *Rouse, supra,* 9 Ohio App.3d at 213, 9 OBR at 363–364, 459 N.E.2d at 601–602.

The trial court's ruling prevented appellant from presenting competent probative evidence on the issue of Christ Hospital's liability. We conclude that its decision to exclude this testimony was an abuse of discretion. Accordingly, appellant's first assignment of error is sustained.

██ In her second assignment of error, appellant states that the trial court erred in prohibiting portions of her "expert's psychological testimony." She argues that in an action for psychiatric negligence, psychologists are qualified to render an opinion as to proximate cause and damages. We find this assignment of error to be well taken.

Evid.R. 601 provided:

"Every person is competent to be a witness except:
" \* \* \*

"(D) A person giving expert testimony on the issue of liability in any claim asserted in any civil action against a physician, podiatrist, or hospital arising out of the diagnosis, care or treatment of any person, unless the person testifying is licensed to practice medicine and surgery, osteopathic medicine and surgery, or podiatric medicine and surgery by the state medical board or by the licensing authority of any state, and unless such person devotes three-fourths of his professional time to the active clinical

practice in his field of licensure, or to its instruction in an accredited university."

Evid.R. 601(D) incorporated the provisions of R.C. 2743.43 with respect to expert testimony on medical liability issues. Staff Note to Evid.R. 601(D); *Price v. Cleveland Clinic Found.* (1986), 33 Ohio App.3d 301, 304, 515 N.E.2d 931, 934–935.

The trial court restricted the testimony of appellant's expert witness, Dr. Joseph Zieleniewski, the psychologist who treated appellant. The court also refused to let Dr. Jill Bley, another psychologist who treated appellant, testify at all.[1] Because these witnesses were not medical doctors, they were clearly precluded from testifying regarding *liability.* However, they were not precluded from testifying regarding damages.

In discussing the distinction between liability and damage issues, the Court of Appeals for Franklin County has stated:

"R.C. 2743.43(A) restricts expert testimony in a medical claim only on the liability issues. The medical claim in this case was based upon negligence. The liability issues are duty and breach of duty, liability being defined as responsibility for conduct. The damage issues are proximate cause and damages. R.C. 2743.43 was not intended to apply to expert testimony on all of the issues otherwise the restrictive adjective liability would not have been used. The restriction applies only to an expert testifying as to fault. * * *" *Wise v. Doctors Hospital North* (1982), 7 Ohio App.3d 331, 333, 334, 7 OBR 427, 431, 455 N.E.2d 1032, 1036, quoting *McCrory v. State* (Mar. 27, 1980), Franklin App. No. 79AP–621, unreported (McCormac, J., concurring), affirmed (1981), 67 Ohio St.2d 99, 21 O.O.3d 63, 423 N.E.2d 156. See, also, *Price, supra,* 33 Ohio App.3d at 304, 515 N.E.2d at 934–935; *Crosswhite v. Desai* (1989), 64 Ohio App.3d 170, 580 N.E.2d 1119.

The purpose of Evid.R. 601(D) is to discourage testimony regarding the proper standard of care by a "professional witness" or a physician who is sequestered in the laboratory and has no first hand knowledge of the duty of care of patients. *Wise, supra,* 7 Ohio App.3d at 334, 7 OBR at 431–432, 455 N.E.2d at 1036; see, also, *McCrory v. State* (1981), 67 Ohio St.2d 99, 103, 21 O.O.3d 63, 65–66, 423 N.E.2d 156, 159–160. The rule seeks to prevent "non-clinicians from testifying about the quality of clinical care." *Price, supra,* 33 Ohio App.3d at 304, 515 N.E.2d at 935. It should not be "applied so narrowly

---

1. DeSilva's contention that the trial court was going to allow Dr. Bley to testify but that appellant's counsel decided not to call her as a witness is completely unsupported by the record. Prior to a break, the trial court stated that it would allow Dr. Bley to testify "to see what happens." After the break, the court stated that it was "reversing itself" and would not allow Dr. Bley to testify at all.

that the right of redress in a medical claim collapses under a undue burden." *Crosswhite, supra,* 64 Ohio App.3d at 177, 580 N.E.2d at 1124. Nothing in Evid.R. 601(D) prevents a qualified expert from testifying as to causation and damages in a malpractice case. We do not believe that allowing Bley and Zieleniewski to testify undermines the purpose of the rule.

Additionally, we find *Parsons v. Mansfield General Hospital* (May 18, 1989), Richland App. No. CA–2661, unreported, 1989 WL 63260, cited by appellees, to be distinguishable. In *Parsons,* a psychiatrist, the defendant in a medical malpractice case, filed a motion for summary judgment. In opposition to the motion, the plaintiff filed the affidavit of a psychologist who stated that the psychiatrist had deviated from the applicable standard of care. Relying on Evid.R. 601(D), the *Parsons* court stated that " * * * the trial court did not err in finding [the psychologist] to be incompetent and unqualified to provide testimony as an expert witness in this matter. A psychologist's testimony fails to rebut a psychiatrist's testimony with regards to a psychiatric patient on numerous medications and the proper discharge of the patient." In contrast to the present case, the psychologist in *Parsons* was clearly attempting to testify as to liability in violation of Evid.R. 601(D). Therefore, we find *Parsons* to be inapplicable.

Accordingly, we hold that both Bley and Zieleniewski, as psychologists who treated appellant, were qualified to testify as to causation and damage. Each could testify to their treatment of appellant and their opinion as to the cause of her distress. Their testimony would have aided the jury in understanding a fact in issue and was admissible pursuant to Evid.R. 702. Any defects in their testimony would affect its weight not its admissibility. The trial court erred by refusing to let Bley and Zieleniewski testify as to causation and damages, and appellant's second assignment of error is sustained.

In her third assignment of error, appellant states that the trial court erred in precluding all evidence that DeSilva sexually molested her. Appellant argues that she was severely limited in presenting her case, particularly in regard to damages, because her expert witnesses would have testified that much of her distress was caused by her fear that DeSilva had molested her while she was under the influence of sodium pentothal. We find this assignment of error is not well taken.

Evid.R. 403(A) provides: "Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." The admission or exclusion of relevant evidence under Evid.R. 403 rests within the sound discretion of the trial court. *Calderon v. Sharkey* (1982), 70 Ohio St.2d

218, 224, 24 O.O.3d 322, 325–326, 436 N.E.2d 1008, 1012–1013; *State v. Jurek* (1989), 52 Ohio App.3d 30, 35, 556 N.E.2d 1191, 1196–1197.

Appellant sought to present evidence that some of DeSilva's other patients told her of sexual misconduct and that she began to fear that DeSilva had molested her while she was under the influence of sodium pentothal. She also sought to introduce expert testimony regarding her fear that she had been molested and tending to prove that she had indeed been molested.

We cannot conclude that the trial court abused its discretion in excluding this evidence. Absent some objective fact proving that DeSilva molested appellant, this testimony is far too speculative to have any real probative value. This evidence would have a strong inflammatory impact, which we conclude would substantially outweigh its probative value. Its presence would tend to invite the jury to speculate about other bad acts committed by DeSilva. See *State v. Smith* (1985), 29 Ohio App.3d 9, 12, 29 OBR 9, 12–13, 502 N.E.2d 656, 660–661. We cannot say that the trial court's decision to exclude this evidence is so unreasonable, arbitrary or unconscionable as to connote an abuse of discretion. See *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 218, 5 OBR 481, 481–482, 450 N.E.2d 1140, 1141. Accordingly, appellant's third assignment of error is overruled.

In her fourth assignment of error, appellant states that the trial court erred in refusing to submit the question of punitive damages to the jury. Appellant argues that she presented sufficient evidence of malice to present a jury question on the issue. We find this assignment of error to be well taken.

Ohio courts have long allowed punitive damages to be awarded in tort actions which involve fraud, malice or insult. *Preston v. Murty* (1987), 32 Ohio St.3d 334, 334–335, 512 N.E.2d 1174, 1174–1176; *Detling v. Chockley* (1982), 70 Ohio St.2d 134, 136, 24 O.O.3d 239, 240–241, 436 N.E.2d 208, 209–210. Mere negligence is not enough; evidence of actual malice must be presented before the question of punitive damages may be submitted to the jury. *Detling, supra,* at 137–138, 24 O.O.3d at 241–242, 436 N.E.2d at 210–212; *Leichtamer v. American Motors Corp.* (1981), 67 Ohio St.2d 456, 471, 21 O.O.3d 285, 294–295, 424 N.E.2d 568, 579. "Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or spirit of revenge *or,* (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." (Emphasis *sic.*) *Preston, supra,* at syllabus.

Additionally, malice may be inferred from conduct and surrounding circumstances. "One who has committed an act would scarcely admit that he

was malicious about it, and so, necessarily, malice can be inferred from conduct." *Detling, supra,* 70 Ohio St.2d at 137, 24 O.O.3d at 241, 436 N.E.2d at 210, quoting *Davis v. Tunison* (1959), 168 Ohio St. 471, 475, 7 O.O.2d 296, 298, 155 N.E.2d 904, 907. "[I]ntentional, reckless, wanton, willful and gross acts which cause injury to person or property may be sufficient to evidence that degree of malice required to support an award of punitive damages in tort actions." *Leichtamer, supra,* 67 Ohio St.2d at 471, 21 O.O.3d at 295, 424 N.E.2d at 579.

We believe appellant's evidence, when viewed as a whole, supports the inference that DeSilva exercised a conscious disregard for appellant's rights and safety and that his conduct had a great probability of causing substantial harm. This case is not a case of simple negligence, such as where a doctor or nurse accidentally gives a patient the wrong type of blood or a property owner fails to keep sidewalks clear of ice and snow. Appellant's evidence, if believed, shows that DeSilva injected appellant with an extremely potent and addicting barbituate between one hundred forty-one and one hundred seventy-one times at a cost of $75 to $100 each. While even appellees' experts acknowledged that feedback and supportive therapy were necessary, DeSilva gave appellant no feedback and conducted no therapy. He did not reveal to appellant the cause of her problems even though he knew that the uncertainty caused her severe distress.

When appellant first went to see DeSilva in 1980, she was a functioning person with some dizziness and some unresolved anger from her childhood. By 1983, she was on disability leave from her job and could no longer function, yet DeSilva did nothing but continue to inject her with sodium pentothal. DeSilva's own records show that appellant's distress increased, yet he continued the same regimen of treatment even though he acknowledged that he knew there were other methods of treatment available. Appellant's experts testified that there was no medical justification for the number of sodium pentothal interviews he conducted and that he was negligent "times ten." Further, despite the court's ruling that appellant could not present evidence regarding her belief that she was sexually molested, there was evidence that DeSilva made improper sexual suggestions and that appellant was left alone with DeSilva despite her request that a nurse be present during the interviews.

We believe appellant's evidence was such that a jury might infer malice from the surrounding facts and circumstances. The trial court should have instructed the jury on punitive damages and allowed the jury to determine if they were appropriate. See *White v. Moody* (1988), 51 Ohio App.3d 16, 21–22,

554 N.E.2d 115, 121–122. Accordingly, appellant's fourth assignment of error is sustained.

In her fifth assignment of error, appellant states that the trial court erred by instructing the jury on comparative negligence and assumption of the risk. She argues that there is no competent evidence that her own actions contributed to her injury. We find this assignment of error to be well taken.

R.C. 2315.19, Ohio's comparative negligence statute provides as follows:

"(A)(1) Contributory negligence or implied assumption of the risk of the complainant or of the person for whom the complainant is legal representative may be asserted as an affirmative defense to a negligence claim.

"(2) Contributory negligence or implied assumption of the risk of a person does not bar the person or his legal representative as complainant from recovering damages that have directly and proximately resulted from the negligence of one or more other persons, if the contributory negligence or implied assumption of the risk of the complainant or of the person for whom he is legal representative was no greater than the combined negligence of all other persons from whom the complainant seeks recovery. However, any compensatory damages recoverable by the complainant shall be diminished by an amount that is proportionately equal to the percentage of negligence or implied assumption of the risk of the complainant or of the person for whom he is legal representative, which percentage is determined pursuant to division (B) of this section. * * *"

Contributory negligence means "any want of ordinary care on the part of the person injured, which combined and concurred with the defendant's negligence and contributed to the injury as a proximate cause thereof, and as an element without which the injury would not have occurred." *Brinkmoeller v. Wilson* (1975), 41 Ohio St.2d 223, 226, 70 O.O.2d 424, 425, 325 N.E.2d 233, 235. Contributory negligence is not a defense in an ordinary tort action unless that negligence is a direct and proximate cause of the injury received. *Bahm v. Pittsburgh & Lake Erie RR. Co.* (1966), 6 Ohio St.2d 192, 194, 35 O.O.2d 307, 308–309, 217 N.E.2d 217, 219–220; *Bird v. Pritchard* (1973), 33 Ohio App.2d 31, 32, 62 O.O.2d 96, 96–97, 291 N.E.2d 769, 770–771.

"Assumption of the risk requires three elements: One must have full knowledge of a condition; such condition must be patently dangerous to him; and he must voluntarily expose himself to the hazard created." *Briere v. Lathrop Co.* (1970), 22 Ohio St.2d 166, 174–175, 51 O.O.2d 232, 237, 258 N.E.2d 597, 603. The gist of the defense of assumption of the risk is consent to or acquiescence in an appreciated or known risk. The practicalities of proof require that the defense of assumption of the risk also be applicable where the

risk is so obvious that the plaintiff must have known and appreciated it. *Wever v. Hicks* (1967), 11 Ohio St.2d 230, 234, 40 O.O.2d 203, 205–206, 228 N.E.2d 315, 318.

"A charge to the jury should be a plain, distinct and unambiguous statement of the law as applicable to the case made before the jury *by the proof adduced.*" (Emphasis added.) *Marshall v. Gibson* (1985), 19 Ohio St.3d 10, 12, 19 OBR 8, 10, 482 N.E.2d 583, 585. It is well established that a trial court should confine its instructions to the issues raised by the pleadings and the evidence. *Becker v. Lake Cty. Mem. Hosp. West* (1990), 53 Ohio St.3d 202, 208, 560 N.E.2d 165, 170–171.

Appellees based their defense of comparative negligence and applied assumption of the risk upon appellant's use of marijuana.[2] The record does not support the conclusion that appellant's use of marijuana was a contributing cause without which her injury would not have occurred. Several experts testified that the use of marijuana would "hinder" her treatment.[3] However, there was no evidence that appellant's use of marijuana was the proximate cause of her distress or that appellant failed to demonstrate reasonable care for her own well being. Compare *Sorina v. Armstrong* (1988), 51 Ohio App.3d 113, 554 N.E.2d 943 (plaintiff's own disregard for her own health caused her injury); *Boltenhouse v. Ohio State Univ. Hosp.* (1989), 44 Ohio Misc.2d 1, 540 N.E.2d 761 (plaintiff's decedent did not exercise due care for her own safety when she ingested an overdose of non-prescription pain killers). In this case, to compare appellant's use of marijuana to DeSilva's repeated injections of sodium pentothal over a four-year period is to compare apples and oranges. Accordingly, we conclude that an instruction on comparative negligence was improper.

Further, there was no evidence that appellant consented to or acquiesced in an appreciated or known risk. Appellant testified that she knew smoking marijuana was not good for her, but she stated she did not know it would hinder her treatment. However, DeSilva knew she was smoking marijuana and knew she was desperate to sleep, yet he did virtually nothing about it. The causes of medical problems are not within the realm of a layman's knowledge. The patient relies almost wholly upon the judgment of the doctor.

---

**2.** Appellees' claim that appellant used "marijuana, Quaaludes and other street drugs" is a distortion of the record. There is no dispute that appellant used marijuana during the course of her treatment by DeSilva. However, the only evidence regarding other drugs was that appellant took one-half of a Quaalude in the late 1970's. This evidence is too remote to be relevant to the arguments made in this assignment of error.

**3.** We would note that appellant's experts testified that it would hinder "suitable treatment" and that DeSilva's treatment was not suitable.

*Herr v. Robinson Memorial Hosp.* (1990), 49 Ohio St.3d 6, 9, 550 N.E.2d 159, 162. Given appellant's complete trust in DeSilva and her lack of notice that the use of marijuana would significantly hinder her treatment, we cannot conclude that an instruction on implied assumption of the risk was appropriate in this case. Accordingly, appellant's fifth assignment of error is sustained.

 In her sixth assignment of error, appellant states that the trial court erred by refusing to allow her to make a complete record. Appellant argues that the trial court abused its discretion when it refused to allow her counsel to state the basis for objections on the record or to have a court reporter present at any bench conferences. We find this assignment of error is not well taken.

 Evid.R. 103(A) provides:

"Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

" * * *

"(2) Offer of proof. In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked. Offer of proof is not necessary if evidence is excluded during cross-examination."

An offer of proof serves the purpose of assisting an appellate tribunal in determining whether the lower court's exclusion of certain evidence was prejudicial to "a substantial right" of the complaining party. For this reason, proffers should be freely permitted outside the presence of the finder of fact when some or all of a witness's direct examination is excluded. As a general rule, a refusal to permit a proffer when direct examination evidence is excluded is error. *Carter v. Carter* (1989), 62 Ohio App.3d 167, 171–172, 574 N.E.2d 1154, 1156–1158.

Although there seemed to be a great deal of confusion given the length and complexity of the trial in this case, we cannot conclude that the trial court prevented appellant from making a complete record. Appellant did make several proffers as to excluded testimony. In fact, the trial judge allowed appellant to submit written proffers of the excluded testimony of several witnesses. Further, despite the confusion, arguably on the trial court's part, appellant did establish a reasonably complete record given the length of the trial and the extensive number of evidentiary rulings by the trial judge.

After reviewing the transcript, and the instances where appellant claims that she could not present testimony, we find that she has failed to demonstrate how she was prejudiced. Appellant could have, pursuant to App.R. 9(C), prepared a statement of the evidence or proceedings from the best

available means including recollection. See *State v. Spirko* (1991), 59 Ohio St.3d 1, 15–16, 570 N.E.2d 229, 246–249. Accordingly, her sixth assignment of error is overruled.

*Judgment reversed*
*and cause remanded.*

JONES, P.J., and WALSH, J., concur.