OPINION
In April of 1995, Plaintiff-Appellants Frank and Fran Swift contacted Defendant-Appellees Allied Pest Control to treat their home for termites pursuant to their contract. Allied sent two technicians to the Swift residence on Friday, April 7, 1995. The Allied technicians sprayed the perimeter of the home and then drilled a hole in the mud room steps and sprayed pesticide into the hole. Instead of spraying into the soil, the pesticide ran behind the basement wall paneling and into the Swifts' craft room. While one technician was spraying the pesticide, the other, Brian Anderson, stayed in the basement to make sure it did not leak into the home. Brian Anderson testified that he did not hear, see or smell the pesticide in the basement prior to leaving the home that day.
Before the technicians left the Swift home, Mrs. Swift noticed a strong odor, so she asked the technicians if it was safe to stay in the house. They advised her that it was. The following morning, Mrs. Swift entered her basement to a very strong odor and discovered the carpet in her craft room, as well as boxes sitting on the floor, were saturated with pesticide. She attempted to phone Allied, but received no answer. Mrs. Swift contacted Poison Control who advised her to open the windows and blow fans on the affected area, which she did. In addition, she and Mr. Swift donned rubber gloves and began moving the damaged boxes and other contents out of the craft room and onto plastic in another room.
On Monday, April 10, 1995, the Swifts contacted Allied and the Department of Agriculture and advised them about the spill. Dale Crumrine, an employee of Allied, came out a few days later and sprayed a mist of bleach mixture on all of the affected surfaces. He claims he was advised by the manufacturer of Dursban, the chemical spilled in the home, that this was the proper method of cleaning a spill. While he was at the residence, Mrs. Swift asked Mr. Crumrine for information on Dursban, which he provided. According to Mrs. Swift, these documents explained that the affected areas of the home needed to be scrubbed down with a bleach mixture in order to remove the chemical. In addition, Tim Anderson with the Department of Agriculture inspected the home after Allied had "cleaned" the affected area and found that the chemical was not properly cleaned and removed.
In the meantime, the Swifts also contacted their homeowner insurance company who had Servicemaster remove the carpet and clean the area. Additionally, Mr. Swift scrubbed it down with bleach and repainted the surfaces. The Swifts also sifted through the boxes that had been in the craft room to inventory personal property damaged by the chemicals.
Immediately following the spill, both Swifts began experiencing several health problems, including diarrhea, severe headaches, lightheadedness, sinus infections, and foot-dragging. In addition, a few weeks after the spill, Mrs. Swift developed Bells palsy, a paralysis of one side of her face. As time went on, the headaches, diarrhea, foot-dragging and Bells palsy subsided, but the Swifts continued to experience severe lack of energy and memory loss. They visited several doctors for treatment and diagnosis, some of whom testified at trial. The experts who testified for the Swifts claimed the Dursban caused all of the symptoms they had experienced and diagnosed them with various specific illnesses, including toxic encephalopathy, peripheral neuropathy, immune impairment, impaired detoxification, chronic fatigue syndrome, and fibromyalgia. Conversely, the Allied experts testified that there were several other probable causes for the symptoms, including the Swifts' existing medical conditions.
There was some conflicting testimony whether the Allied employees knew about the spill at the time it occurred. Brian Anderson testified that he was not aware that the pesticide had entered the home instead of going into the soil as they had intended. However, Tim Anderson with the Department of Agriculture (no relation) opined that if the Allied technician was in the basement while the pesticide was being applied, he would have smelled it and heard it running down the walls. In addition, Brian Anderson's supervisor testified that Brian told him about the spill on Saturday, April 8, one day after the spill, but two days before the Swifts contacted Allied.
Before trial, the Swifts requested that the jury be instructed on a claim of fraud, which the trial court denied. At trial, the jury was provided with several interrogatories and verdict forms. The interrogatories stated as follows:
 1. Do you find that the Defendant committed one or more unconscionable acts specifically defined by the court in the jury instructions?
 2. If you answered Yes to Interrogatory No. 1, do you find that the Defendant "knowingly" committed the acts that violate the law?
 3. Do you find that the Defendant committed one or more unfair or deceptive acts as specifically defined by the Court in the jury instructions?
 4. Do you find that the violation resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid the violation?
The jury answered "yes" to each of these interrogatories. On the verdict forms, the jury awarded the Swifts $8000 for violation of the Consumer Sales Practices Act, $7000 for breach of contract, $5000 for Frank Swift's personal injury claim, and $30,000 for Fran Swift's personal injury claim.
Following the trial, the Swifts filed a motion for treble damages and attorney fees pursuant to R.C. 1345.09(B) and (F). The trial court denied this motion, relying on R.C. 1345.11(A) and the jury's answer to the fourth interrogatory. The Swifts appealed, raising the following assignments of error:
 I. The trial court erred when it did not award the appellants' attorney's fees and treble damages as permitted by the Ohio Consumer Sales Practices Act, all to the appellants' detriment.
 II. The trial court erred when it failed to instruct the jury on the issues of fraud and punitive damages.
Allied then cross-appealed raising the following assignments of error:
 III. The trial court erred by admitting into evidence the opinions of plaintiffs-appellants' medical experts.
 IV. The trial court erred by failing to direct a verdict in defendant-appellee's favor with respect to plaintiffs-appellants' personal injury claims.
 I
The Swifts argue that the trial court should have awarded treble damages and attorney fees pursuant to R.C. 1345.09(B) and (F) of the Ohio Consumer Sales Practices Act ("CSPA"). R.C. 1345.09(F) allows a court to award reasonable attorney fees if "[t]he supplier has knowingly committed an act or practice that violates this chapter." R.C. 1345.09(F)(2); Einhorn v. Ford Motor Co. (1990), 48 Ohio St.3d 27, 29. Because the jury found in Interrogatory No. 2 that Allied knowingly committed an unconscionable act in violation of the statute, the Swifts feel attorney fees should have been awarded.
In addition, R.C. 1345.09(B) allows a consumer to recover three times the amount of his actual damages if the violation committed by the defendant was an act or practice which had already been (1) declared deceptive or unconscionable by a rule adopted under R.C. 1345.05(B)(2) prior to the consumer transaction, or (2) declared to have violated R.C.1345.02 or 1345.03 by a case made available by the attorney general pursuant to R.C. 1345.05(A)(3) prior to the consumer transaction involved. See Hahn v. Doe (Mar. 23, 1995), Franklin App. No. 94APE07-1024, at p. 3. Although the Swifts did submit to the trial court cases made available by the attorney general, these were not considered in the court's decision because the court overruled the request on other grounds.
The grounds on which the trial court overruled the Swifts' request for attorney fees and treble damages were derived from another section of the Consumer Sales Practices Act. In this regard, R.C. 1345.11(A) provides:
 [I]f a supplier shows by a preponderance of the evidence that a violation resulted from a bona fide error notwithstanding the maintenance for procedures reasonably adopted to avoid the error, * * * no party shall be awarded attorney's fees, and monetary recovery shall not exceed the amount of actual damages resulting from the violation.
According to this section, when a jury finds a violation has resulted from a bona fide error, the plaintiff is not entitled to attorney fees or treble damages. The language of R.C. 1345.11(A) was reflected in Jury Interrogatory No. 4, to which the jury responded affirmatively, finding Allied's violation did result from a bona fide error. Accordingly, pursuant to the statute, it would appear attorney fees and treble damages were properly denied.
However, the Swifts argue that Jury Interrogatories 2 and 4 are inconsistent. After much deliberation, we agree. Even though the interrogatories reflect the language of the statutes, as applied in this case, they cannot be reconciled.
In order to violate the CSPA, a supplier must commit an unfair, deceptive or unconscionable act. See R.C. 1345.02 and 1345.03. It is difficult to conceive how Allied's actions in this case could have been unfair, deceptive or unconscionable and also a bona fide error. After reading several cases involving R.C. 1345.11(A), we discovered that cases which found that the CSPA was knowingly violated also found no bona fide error. See, e.g. Andrews v. Scott Pontiac Cadillac GMC, Inc. (1991),71 Ohio App.3d 613, 621 (finding a dealership knowingly committed an act in violation of the CSPA and there was no bona fide error); Birch v. Al Castrucci, Inc. (Aug. 20, 1999), Montgomery App. No. 17512, unreported, at pp. 4-5 (holding that a dealership knowingly violated the CSPA and there was no bona fide error); Hardoby v. Lent Auto Serv., Inc. (Oct. 5, 1988), Lorain App. No. 4296, unreported, at p. 3 (remanding after summary judgment was granted because a genuine issue existed as to whether the defendant committed a deceptive act; also advising the court that if a bona fide error existed, it must only award actual damages). We found no cases which held both that the act was knowingly violated and there was a bona fide error.
We found two cases where the court held the CSPA had been violated, although not "knowingly" violated, and that the violation resulted from a bona fide error. See Layne v. Toth Buick, Inc. (Sept. 9, 1992), Summit App. No. 15523, unreported (focusing on the issues of attorney fees and costs, but details of actual violation are very vague); Zindle v. Hawks Appliance Serv., Inc. (Sept. 2, 1987), Summit App. No. 13016, unreported. In Zindle, a refrigerator repairman was found to have violated R.C.1345.02 because his actions technically violated an administrative regulation adopted pursuant to R.C. 1345.02. Id., at p. 4. These regulations required any repair or service provider to furnish its customers with a written notice allowing them to choose a written, oral or no estimate. In addition, a regulation existed which required repair or service providers to hang a sign in their place of business advising customers of this requirement. Because Hawks complied with neither of these regulations, the court found Hawks had violated the statute. However, Hawks orally advised Zindle that the repairs would cost $72 plus tax which was exactly the amount requested for repairs. In addition, the court found that in most cases Hawks would either complete the repairs at customers' residences or pick up the appliances himself and bring them back to his shop, negating the necessity of the posted notice. Therefore, the court found that Hawks' violation of the CSPA was a bona fide error, as he had procedures in place to prevent error and did not intend to deceive his customers. Id., at pp. 4-5.
The present case is factually distinguishable from the Zindle case. The jury in this case was instructed separately on acts alleged to be unfair or deceptive and acts alleged to be unconscionable. The acts alleged to be unfair or deceptive were:
 being aware that there had been a spill or misapplication of the pesticide, the defendant failed to inform the homeowners; and/or after the misapplication on April 7, the defendant falsely informed Mrs. Swift that there was no problem and there was no need to leave the residence; and/or the defendant falsely represented to the plaintiffs that the work would be done in accordance with all applicable laws and regulations.
The acts submitted as allegedly unconscionable were:
 defendant intentionally made misleading statements of opinion upon which the plaintiffs relied to their detriment, specifically that it was safe for the plaintiffs to remain in their house the day of the treatment and that it, the defendant, had properly cleaned up the excess pesticide.
Based on the interrogatories, the jury found that an unconscionable act was knowingly committed, an unfair or deceptive act was committed, and that "the" violation was the result of a bona fide error. Because the interrogatories did not require the jury to specifically find which of Allied's acts violated which sections of the CSPA, we can only speculate as to which or how many of the five alleged acts the jury found Allied had violated.
When considering the three alleged unfair or deceptive acts, the only one that could even potentially have resulted from a bona fide error would be the false representation that the work would be performed in accordance with all applicable laws and regulations. Even if the jury intended only this in their response to Interrogatory No. 3 and found it to be a bona fide error, we still must contend with the jury's finding that Allied knowingly committed an unconscionable act. By definition, an act knowingly committed cannot also be a bona fide error. Because the jury specifically found in Interrogatory No. 2 that Allied knowingly violated the CSPA, the Swifts should be entitled to attorney fees under R.C. 1345.09(F).[1] On the other hand, because the jury specifically found that "the" violation was a bona fide error, the Swifts should not be entitled to treble damages or attorney fees under R.C. 1345.11(A). Consequently, the interrogatories as given are hopelessly incomprehensible.
We are thereby left in a quandary. We cannot simply ignore any of the jury interrogatories as they are forever a part of the record. Moreover, based on the jury's response to Interrogatory No. 4, we understand why the trial court denied treble damages and attorney fees under R.C.1345.11(A). However, we agree with the Swifts that under the facts of this case, the interrogatories are contradictory and insufficient to reach a conclusion on the issue of treble damages and attorney fees. Therefore, we will remand this case to the trial court for the Swifts to elect whether they wish to preserve the verdict as it stands or engage in a new trial with much more explicit jury interrogatories.
 II
In their second assignment of error, the Swifts challenge the trial court's failure to instruct the jury on fraud and punitive damages. The fraud claim is based on the assumption that Brian Anderson knew of the spill prior to leaving the Swift home on April 7, 1995, and failed to inform them about it. At the end of its case, Allied raised a motion for directed verdict which was discussed at length between the court and counsel. Finally, the court concluded on the record that there was no evidence to support the fraud and punitive damages claims and therefore prohibited the issue from going to the jury.
In order to sustain a motion for a directed verdict, the court must find, after construing the evidence in a light most favorable to the non-moving party, that reasonable minds could only come to a conclusion adverse to the non-moving party. Texler v. D.O. Summers Cleaners Shirt Laundry Co. (1998), 81 Ohio St.3d 677, 679. In making this determination, the trial court must not weigh the evidence or decide the credibility of the witnesses. Id. Instead, "if there is substantial competent evidence to support the party against whom the motion is made, upon which evidence reasonable minds might reach different conclusions, the motion must be denied." Id., citing Hawkins v. Ivy (1977),50 Ohio St.2d 114, 115 (other citations omitted).
The Swifts were required to prove the following elements to establish a claim of fraud:
 (a) a representation or, where there is a duty to disclose, concealment of a fact,
(b) which is material to the transaction at hand,
 (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
 (d) with the intent of misleading another into relying upon it,
 (e) justifiable reliance upon the representation or concealment, and
 (f) a resulting injury proximately caused by the reliance.
Amerifirst Savings Bank of Xenia v. Krug (1999), 136 Ohio App.3d 468,490-91, citing Burr v. Stark Cty. Bd. of Commrs. (1986), 23 Ohio St.3d 69, paragraph two of the syllabus. Intent to mislead can be inferred or presumed depending on the facts and circumstances of the case. Jenkins v. Clark (1982), 7 Ohio App.3d 93, 101.
The facts pertinent to our inquiry are as follows. Brian Anderson, the Allied technician, testified that he stood in the basement while the Dursban was being sprayed and did not hear, see or smell the pesticide leaking into the basement. He did not specifically recall Mrs. Swift asking him if it was safe to stay in the home, but did admit that if asked, he would have told her that it was safe. Garry Dailey, Brian Anderson's supervisor, testified that on Saturday, April 8, 1995, Brian informed him about the spill. This was two days before the Swifts were able to make contact with Allied to report the spill. Dailey further testified that he considered the spill to be a "major incident."
In addition, Tim Anderson with the Department of Agriculture testified that if in fact Brian Anderson was in the basement while the Dursban was being sprayed, due to the pressure used to spray the pesticide, he should have heard and smelled it coming into the home. While Tim Anderson was at the residence approximately three to four days after the spill, he also advised the Swifts that they should vacate the home until the chemical was properly removed.
After reviewing the evidence in a light most favorable to the Swifts, it appears reasonable minds could have reached different conclusions as to whether Allied committed the tort of fraud against the Swifts. The testimony of Garry Dailey and Tim Anderson could allow the jury to conclude that Brian Anderson knew about the spill prior to leaving the house on Friday and concealed it from the Swifts, advising them it was safe to stay in the home. Intent to mislead could be implied from the testimony that he knew there was a spill on a late Friday afternoon and purposely did not advise the Swifts so he would not have to deal with it. The Swifts could have justifiably relied on Brian Anderson's go-ahead to stay in the home, and testimony was given regarding their resulting injuries. Therefore, the trial court erred in directing a verdict in favor of Allied on the claim of fraud. Nevertheless, we find that the Swifts were not prejudiced by the error.
The jury awarded the Swifts actual damages under the theories of breach of contract, negligence and the Consumer Sales Practices Act. The only benefit to having the jury instructed on fraud would have been the potential for punitive damages. However, in order to establish a claim for punitive damages, the plaintiff must not only prove the elements of fraud, but also "the existence of malice or ill will, or must demonstrate that the wrongdoing is particularly gross or egregious." Leal v. Holtvogt (1998), 123 Ohio App.3d 51, 78. Even if the jury were to find that Allied committed fraud by concealing that there had been a spill, there is no evidence that Brian Anderson or anyone else from Allied acted maliciously or egregiously in doing so. As a result, no evidence was produced to allow the jury to be instructed on punitive damages. Consequently, the trial court's failure to instruct on fraud was harmless error. The Swifts' second assignment of error is overruled.
 III, IV
In its cross-appeal, Allied argues that the trial court erred in allowing the expert testimony of both Dr. Boyles and Dr. Ziem. Because Allied feels this testimony should have been excluded, it also argues that a directed verdict should have been granted on the Swifts' personal injury claims. We disagree with both of these contentions.
The admission or exclusion of expert testimony is within the sound discretion of the trial court, and will not be reversed absent an abuse of that discretion. State v. Jones (2000), 90 Ohio St.3d 403, 414. An abuse of discretion connotes an arbitrary, capricious or unconscionable decision by the trial court. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219. Furthermore, admission of expert testimony should be favored provided the elements of Evid.R. 702 are satisfied. State v. Williams (1983), 4 Ohio St.3d 53, 57.
According to Evid.R. 702, an expert may testify if:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 (1) The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 (2) The design of the procedure, test, or experiment reliably implements the theory;
 (3) The particular procedure, test, or experiment was conducted in a way that will yield an accurate result.
Under Ohio law, any doctor licensed to practice medicine may testify as an expert on medical issues. Joyce-Couch v. DeSilva (1991),77 Ohio App.3d 278, 285. Further, an expert witness need not be the best witness on the subject, but need only demonstrate some knowledge on the particular subject superior to the knowledge possessed by the trier of fact. Scott v. Yates (1994), 71 Ohio St.3d 219, 221. In fact, neither special education nor certification are required to qualify a witness as an expert. State v. Baston (1999), 85 Ohio St.3d 418, 423.
Both Dr. Boyles and Dr. Ziem are doctors licensed to practice medicine who have knowledge about diagnosing the symptoms experienced by the Swifts. In an attempt to refute Dr. Ziem's qualifications, Allied repeatedly stressed her lack of board certification. However, as noted above, this is irrelevant when deciding an individual's expert status. Clearly, both elements (A) and (B) were met by both doctors.
Allied focuses its argument on Evid.R. 702(C). In this regard, Allied alleges that Dr. Ziem's testimony did not meet the Daubert standard as explained in Miller v. Bike Athletic Co. (1998), 80 Ohio St.3d 607, 611. The Miller court held that expert testimony is only admissible if the reasoning or methodology underlying it is scientifically valid. Several factors should be considered to assess the reliability: "(1) whether the theory or technique has been tested, (2) whether it has been subjected to peer review, (3) whether there is a known or potential rate of error, and (4) whether the methodology has gained general acceptance." Id. These factors simply aid the court in making a reliability determination, the inquiry itself is flexible. Id. In fact, the Miller court pointed out that these factors should not be used to exclude testimony which is confusing or of questionable reliability, but instead the court must focus on its helpfulness to the trier of fact. Id. at 614.
In its brief, Allied attacked the reliability of each of the six diagnoses made of the Swifts by Dr. Ziem. These attacks ranged from arguing that the illness was not widely recognized to challenging her methodology in diagnosing the illness. Allied further challenged Dr. Boyles' diagnosis of Bells palsy because it was a disease of unknown etiology. Allied's contentions were based primarily on the testimony of its own expert, Dr. Linz. However, it is not the province of court to choose the testimony of one expert over another just because it believes one more. Miller, supra, at 613. This is a determination properly left for the trier of fact. Id.
Both Drs. Ziem and Boyles testified to the validity of the diagnoses made by Dr. Ziem. In addition, both Drs. Ziem and Boyles were treating the Swifts for their illnesses. Dr. Ziem took a history from each, reviewed their records, physically examined them and performed multiple tests prior to making her diagnoses. "If Ohio courts considered the examination of a patient, review of his medical records, and the taking of his history to be an unreliable methodology, the bulk of all medical testimony would be inadmissible." Hutchins v. Delco Chassis Systems, GMC (Feb. 20, 1998), Montgomery App. No. 16659, unreported, at p. 4. Hence, regardless of the weight due Dr. Ziem's and Dr. Boyles' testimony, they did provide a valid explanation of the cause of the Swifts' injuries that the jury was entitled to hear. See, Laderer v. St. Rita's Med. Ctr. (1997), 22 Ohio App.3d 587, 598.
Based on the foregoing, we do not find that the trial court abused its discretion in allowing the testimony of Dr. Ziem and Dr. Boyles. Because their testimony was admissible, reasonable minds could have, and did, reach a conclusion in favor of the Swifts. See, Texler, supra. As a result, the directed verdict was properly overruled. Both of Allied's assignments of error on its cross-appeal are accordingly overruled.
Judgment is affirmed in part and remanded in part consistent with this opinion.
WOLFF, P.J., and GLASSER[2], J., concur.
[1] The analysis required to award treble damages under R.C. 1345.09(B) was never addressed by the trial court since it based its denial on R.C.1345.11(A).
[2] Honorable George M. Glasser, Retired from the Sixth District Court of Appeals, Sitting by Assignment of the Chief Justice of the Supreme Court of Ohio.