*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0098p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

————————————

ABDUL AWKAL,

        *Petitioner-Appellant,*

    *v.*

BETTY MITCHELL,

        *Respondent-Appellee.*

No. 01-4278

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 00-00252—Donald C. Nugent, District Judge.

Argued: October 22, 2008

Decided and Filed: March 16, 2009

Before: MOORE, COLE, and GILMAN, Circuit Judges.

————————————

**COUNSEL**

**ARGUED:** R. Brian Moriarty, Cleveland, Ohio, for Appellant. Laurence R. Snyder, OFFICE OF THE OHIO ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Kevin M. Cafferkey, LAW OFFICES, Cleveland, Ohio, Thomas F. O'Malley, Jr., LAW OFFICE, Cleveland, Ohio, for Appellant. Jonathan R. Fulkerson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, Michael L. Collyer, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

    MOORE, J., delivered the opinion of the court, in which COLE, J., joined. GILMAN, J. (pp. 20-30), delivered a separate dissenting opinion.

————————————

**OPINION**

————————————

    KAREN NELSON MOORE, Circuit Judge. In 1992, an Ohio jury convicted Petitioner-Appellant, Abdul Awkal ("Awkal"), of two counts of aggravated murder with prior calculation and design with mass-murder and firearm specifications. The trial court

1

sentenced Awkal to death as recommended by the jury. Awkal now appeals the district court's decision to deny his petition for a writ of habeas corpus. We granted a certificate of appealability allowing Awkal to raise claims of ineffective assistance of counsel at the guilt and penalty phases and of prosecutorial misconduct.

We hold that Awkal's counsel provided ineffective assistance at the guilt phase of trial by calling an expert witness who testified that Awkal was sane at the time of the murders, an opinion that directly contradicted Awkal's only defense. Because we **REVERSE** the district court's judgment based on this conclusion, we do not decide whether Awkal's counsel was ineffective at the penalty phase of trial or whether the prosecutor's statements implying that Awkal would be set free if the jury found him not guilty by reason of insanity constituted prosecutorial misconduct. Accordingly, we **REVERSE** the district court's judgment and **REMAND** this case with instructions that the district court issue a conditional writ of habeas corpus requiring Awkal's release unless the State of Ohio commences a new trial within 180 days from the date that this judgment becomes final.

## I. BACKGROUND

In 1992, Awkal was tried in Ohio state court for the shooting deaths of his wife, Latife Awkal, and her brother, Mahmoud Abdul-Aziz. Awkal was convicted of two counts of aggravated murder with prior calculation and design with mass-murder and firearm specifications. After the penalty phase of trial, the trial court followed the jury's recommendation and sentenced Awkal to death. On direct appeal, the Ohio Supreme Court described the facts of the case as follows:

> On January 7, 1992, appellant, Abdul Hamin Awkal, shot and killed his estranged wife, Latife Awkal, and his brother-in-law, Mahmoud Abdul-Aziz, at the Family Conciliation Services Department of the Cuyahoga Domestic Relations Court. Appellant was captured in the courthouse basement not far from where the shooting took place.
> Awkal arrived in the United States from Lebanon about 1984, when he was twenty-four. He lived with family members in Detroit, Michigan, and worked as a dishwasher and gas station attendant. In 1985, Awkal suffered a mental breakdown at the gas station after he believed he had been accused of theft by his employer. He became hysterical, cursing and breaking things, vomited and then collapsed. He was taken to Detroit Medical Center in a straitjacket. Awkal was apparently released into his

brother's custody later that same day, but disregarded instructions to follow up with a psychiatrist.

Later, Awkal began working at a General Motors factory in Michigan. He was eventually transferred to the Chevrolet plant in Parma, Ohio. He had difficulty sleeping during this period, and was prescribed medication to help him sleep.

Awkal's family arranged for him to meet his wife, Latife, after his arrival in Cleveland. This type of arranged marriage was common in his Islamic faith. Awkal's need for sleeping pills diminished after he met his wife. Awkal and Latife were married under Islamic law in March 1989 and under Ohio law in April 1989. Later in 1989, Awkal went to Cleveland Metropolitan General Hospital complaining of numbness down his side. Although Awkal was again told to talk to a psychiatrist, he never did so. Awkal and Latife had a daughter, Zaynab, born in September 1990.

On their honeymoon, Latife told Awkal she did not love him, but that she understood that love would follow. He unsuccessfully attempted to improve their relationship by opening a bank account for her, teaching her to drive, encouraging her to attend school, and helping her parents with various household tasks.

Latife and her brothers felt that Awkal was not a good Muslim. Awkal did not spend sufficient time in daily prayer and he enjoyed music and celebrating Christian holidays, such as Christmas. Latife and her brothers did not listen to music, or celebrate Christian holidays, and prayed five or six times a day. Latife's brother, Mahmoud Abdul-Aziz, tried to teach Awkal the tenets of their family's Islamic faith, but Awkal viewed Mahmoud's actions as interference with his freedom, and believed that he was harassed and threatened by Mahmoud because of his religious beliefs.

Awkal's marital life was dissolving. Latife spent many nights away from Awkal and eventually asked for an Islamic divorce. According to Awkal, a Muslim husband may divorce his wife merely by telling her, "I divorce you, I divorce you, I divorce you." Awkal granted her request on October 13, 1991, but then Latife agreed to remarry him under Islamic law. Latife felt that she had been shamed and that her baby had been made illegitimate by the divorce.

On October 16, 1991, Latife found out that she had contracted a venereal disease from Awkal. The next day, Latife moved out of the marital home, moved in with Mahmoud, and started divorce proceedings. A divorce complaint and motions for spousal support, child support, visitation and restraining orders were filed in October 1991. Latife talked of returning to Lebanon with the baby.

Awkal was hurt by his family problems and sought counseling, but declined medication. Awkal had counseling sessions four times in November 1991, because he was depressed and suicidal. These feelings were brought on by the divorce and Awkal's belief that Latife's brothers and their religion had interfered with his life and his marriage. Awkal's psychological records reflect that he was very angry with Latife and her brothers because of the divorce.

On November 8, 1991, Awkal bought a nine-millimeter semi-automatic pistol, allegedly to defend himself from Latife's brothers. The evening of that same day and the morning of the next, Awkal called Latife and her brother, Omar Abdul-Aziz, threatening to kill her and her entire family if the divorce was not dismissed. Latife reported the call to her divorce attorney, who sent a letter to Awkal's attorney regarding the threats.

Awkal attended hearings in his divorce case on December 10, 17, and 19, 1991, without incident. During this period, Awkal and Latife agreed to a child visitation schedule and temporary child and spousal support. At Latife's insistence, the visitation order prohibited Awkal from participating in any Christmas-related activities with the baby during his visitation. Awkal also agreed that the family checking accounts, containing approximately $4,800, which had been frozen by the domestic relations court, were to be equally divided between Latife and Awkal.

A meeting was scheduled for 2:00 p.m. on January 7, 1992, at the Family Conciliation Services Department, Room 52, located in the basement of the old Cleveland courthouse. Latife came early to the meeting with her brother, Mahmoud, and her baby. They waited in the hall outside for Awkal to arrive.

Awkal arrived at the courthouse parking garage at 1:48 p.m. from Michigan, where he had spent the weekend with relatives. On his person were copies of the baby's medical records, which had been checked out from the treating HMO over a month earlier, and numerous childcare supplies, including diapers, baby food, and clothing. Prior to the meeting, Awkal wrote a check to his brother for nearly the entire contents of the frozen checking accounts, and changed his address at the post office to his brother's house in Michigan.

Awkal confronted Mahmoud and Latife in the hallway at approximately 2:00 p.m. No harsh words or raised voices were heard from the hall before the shooting. However, "panicky" voices were heard immediately before the three entered Room 52. Awkal chased Latife and Mahmoud into the room, where he shot his wife and her brother at close range. Five shell casings were found inside the room; one shell casing was found in the hall outside the room.

Awkal then picked up the baby from the bench outside the room and walked quickly through the basement halls of the courthouse with her in his arms. Several armed deputies confronted Awkal in the hallway. Awkal pointed his gun at his head and then at his daughter's head, threatening to kill her and then himself. Awkal vowed that nobody was going to take his baby.

When a deputy tried to grab Awkal's gun, Awkal backed further down the hall with the baby. While proceeding down the hall, Awkal was confronted by another deputy, who attempted to disarm Awkal. Awkal evaded this attempt, but was shot in the back while trying to escape.

When Awkal was taken into custody, his pistol was cocked, ready to fire, and contained six live rounds (one in the chamber; five in the magazine). Awkal also had another magazine containing thirteen rounds of

live ammunition in his coat pocket. The bullets retrieved from Mahmoud's body and from Room 52 were fired from Awkal's gun.

At the hospital the next day, Awkal, after being advised of his Miranda rights, told police that he had confronted Mahmoud in the hallway and demanded that Mahmoud "profess that Allah was the only God." When Mahmoud did not do so, Awkal shot the victims. Awkal stated that he thought that he had shot himself.

Awkal was indicted on two counts of aggravated murder with prior calculation and design, including the multiple-murder death penalty specification. He was also indicted on two counts of felonious assault, including a firearm specification. Awkal pled "not guilty" and "not guilty by reason of insanity" to the charges against him.

While awaiting evaluation by a court-appointed psychiatrist to determine whether he was sane and competent to stand trial, Awkal reportedly had hallucinations involving his wife, who spoke to him and told him to join her. Two psychiatrists had examined Awkal at the county jail and found him to be depressed and angry. Awkal was prescribed anti-depressant and anti-anxiety drugs. These drugs did not stop him from having the hallucinations, and he was prescribed different anti-psychotic and anti-depressant medications.

Awkal was found sane at the time of the murders in the preliminary sanity report. However, the severity of his depression rendered him incapable of aiding with his defense, and the trial court found Awkal not competent to stand trial. He was ordered to the Dayton Mental Health Center, Forensic Unit, for treatment and further evaluation. During his stay in Dayton, Awkal continued to receive anti-psychotic medication, but at greater levels. He was also placed on anti-depressant and anti-anxiety medications. On September 3, 1992, the trial court found Awkal competent to stand trial, but returned him to Dayton for further treatment until the trial started.

In October 1992, a jury was impaneled. During the trial, defense counsel complained to the court that Awkal's condition had deteriorated and suggested that a new competency evaluation be undertaken. The trial court refused to have Awkal reevaluated, but stated that it would watch Awkal closely to see that he was paying attention to the trial and helping with his own defense. After the state closed its case in chief, the trial court dismissed one of the felonious assault charges.

Several witnesses testified on Awkal's behalf during the guilt phase. Dr. Paul E. Hewitt, a psychologist, was called to give an opinion on the issue of prior calculation and design. However, when the court learned that Dr. Hewitt was not a licensed psychologist in Ohio, his testimony was stricken from the record. Dr. Magdi S. Rizk, the psychiatrist who conducted Awkal's pretrial sanity and competency evaluations, testified that Awkal was sane at the time of the murders. Finally, Dr. Eileen S. McGee, a psychiatrist awaiting board certification, testified that Awkal was insane at the time of the shooting, that he did not know what he did was wrong, and that Latife and Mahmoud had provoked the incident.

Awkal testified on his own behalf. He stated that Mahmoud and Latife's other brothers were religious fanatics, and had harassed him and interfered in his life. Awkal testified that he purchased the gun to protect himself from Latife's brothers, who had threatened him and, on one occasion, forced him to kneel down before them, swearing allegiance to their religious sect. He denied threatening Latife or her brother.

Awkal stated that on the morning in question he met Latife in the hallway of the courthouse, and asked her to come back to him. She refused, and he went back to his car to get his gun, intending to kill himself in front of Latife to make her regret her decision to divorce him. When Awkal returned he asked Latife if he could hug his daughter one last time. Latife agreed, but Mahmoud confronted Awkal, stating that the baby was not Awkal's, and that Awkal would never see her again. Awkal testified that Mahmoud's face "turn[ed] into that of a monster" and that the walls then collapsed. The next thing Awkal knew, he awoke in the hospital.

On rebuttal, the prosecution presented Dr. Edward Dutton, a forensic psychiatrist, who testified that Awkal was malingering, that he understood what he had done was wrong, and that he had acted out of anger.

The jury found Awkal guilty as charged on the aggravated murder charges, but not guilty on the remaining felonious assault charge.

Several witnesses, including Drs. Paul Hewitt, Eileen McGee, and Salah Samy, testified on Awkal's behalf during the penalty phase. Dr. Hewitt testified that Awkal's problems were part of a life-long anxiety problem, and believed that Mahmoud's threats and religious fanaticism were extremely strong provocation and had facilitated the shooting. Dr. Hewitt believed that Awkal's reaction was spontaneous and that he did not have the ability to conform his conduct to the requirements of Ohio law when he committed the murders.

Dr. McGee testified that the religious interference of Mahmoud and his brothers was a strong provoking force in the murders. Dr. McGee also testified that Awkal's reaction was triggered by Mahmoud's provocation, and that Awkal did not have the ability to conform his conduct to the requirements of the law of Ohio when the murders occurred.

Dr. Samy, Awkal's treating psychiatrist in Dayton, testified that Awkal was not malingering, and that he lost his judgment and control and awareness of what he was doing just prior to the murders. Dr. Samy testified that Awkal was not sane at the time of the murders. Dr. Samy also believed that Latife and Mahmoud facilitated the incident.

Awkal gave an unsworn statement, in which he explained his childhood situation, his religious problems with his brothers-in-law, and how these religious problems caused his marital problems. He also talked about how after Mahmoud's face became that of a monster, the walls collapsed down upon him. The next thing Awkal knew, he woke up in the hospital.

The prosecution rebutted this testimony with Dr. Edward Dutton, who believed that Awkal was malingering.

> The jury found Awkal guilty of the aggravated murder charges and recommended death. The trial court agreed and imposed the death penalty. The court of appeals affirmed the decision of the trial court.

*State v. Awkal*, 667 N.E.2d 960, 963-66 (Ohio 1996). Awkal's convictions were affirmed on direct appeal. *Id.* at 966; *see also State v. Awkal*, 1995 WL 229123 (Ohio Ct. App. 1995). The Ohio courts also denied Awkal's petitions for post-conviction relief. *See State v. Awkal*, 708 N.E.2d 209 (Ohio 1999); *State v. Awkal*, 1998 WL 827585 (Ohio Ct. App. 1998).

In 2000, Awkal filed a petition for a writ of habeas corpus in the United States District Court for the Northern District of Ohio. The district court denied Awkal's petition and did not grant a certificate of appealability. We granted a certificate of appealability permitting Awkal to raise claims of ineffective assistance of counsel and prosecutorial misconduct. In 2004, during the pendency of his habeas petition, we received a letter from Awkal containing a motion to terminate his appeal. After holding a number of evaluations and hearings to explore Awkal's psychological status, the district court determined that Awkal was not competent to terminate his appeals. We now review Awkal's ineffective-assistance and prosecutorial-misconduct claims.

## II. ANALYSIS

### A. Standard of Review

When considering a habeas petition, "[w]e review the legal basis for a district court's dismissal of a § 2254 petition *de novo* and the court's factual findings underlying its analysis for clear error." *Davis v. Coyle*, 475 F.3d 761, 766 (6th Cir. 2007). Awkal filed his habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), so our review is subject to its constraints. *Carter v. Mitchell*, 443 F.3d 517, 524 (6th Cir. 2006). AEDPA sets the following standard for our review:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2).

The Supreme Court has explained these standards as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Terry Williams v. Taylor*, 529 U.S. 362, 412-13 (2000); *see also Thompkins v. Berghuis*, 547 F.3d 572, 580 (6th Cir. 2008). We have held that "clearly established law under [AEDPA] encompasses more than just bright-line rules laid down by the [Supreme] Court. It also clearly includes legal principles and standards enunciated in the Court's decisions." *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002).

## B.  Claims of Ineffective Assistance of Counsel

Awkal contends that he received ineffective assistance of counsel at the guilt and penalty phases of his trial. At trial, Awkal's sole defense was that he was not guilty by reason of insanity. Awkal argues that his attorney's guilt-phase performance was ineffective because his attorney failed to present a competent mental-health expert to support this defense. Awkal also asserts that he received ineffective assistance of counsel at the penalty phase of his trial because his attorney failed to present certain mitigating evidence.[1]

---

[1] In both his guilt- and penalty-phase claims of ineffective assistance, Awkal argues that he was denied his constitutional right to an appropriate expert under *Ake v. Oklahoma*, 470 U.S. 68 (1985). Even assuming that this claim is not procedurally defaulted and that it falls within the scope of the certificate of appealability, we conclude that it would not succeed on the merits.

In making this claim, Awkal relies heavily on *Skaggs v. Parker*, 235 F.3d 261 (6th Cir. 2000). In *Skaggs*, the defendant asserted an ineffective-assistance claim and a claim that he had been denied due process under *Ake*. *Skaggs*, 235 F.3d at 267 n.2. Skaggs based both of these claims on the fact that defense counsel had chosen a fraudulent and erratic psychiatrist to assist in Skaggs's defense. *Id.* This court explained that the two claims are distinct: "[O]ur concern under *Ake* is with the actions of the [State] and whether Skaggs had 'access to a competent psychiatrist' in preparation of his defense.... The fact that defense counsel failed to engage a competent psychiatrist to testify on Skaggs's behalf, however, is significant to Skaggs's ineffective assistance of counsel claim." *Id.* Awkal makes no clear argument that the state, rather than his own counsel's errors, denied him access to a competent expert. The record shows

### 1. Clearly Established Federal Law

To succeed on his ineffective-assistance claims, Awkal must first demonstrate that his counsel's performance was deficient, namely that his "counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). Next, Awkal must show that this deficiency resulted in prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Finally, because our review of this case is controlled by AEDPA, Awkal must "show that the [Ohio Supreme Court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002).

### 2. Ineffective Assistance of Counsel at the Guilt Phase

#### a. Deficient Performance

At trial, Awkal's sole defense to the murder charges that he faced was that he was not guilty by reason of insanity. During the guilt phase of trial, Awkal's counsel attempted to present the testimony of three expert witnesses to support this defense: Dr. Paul E. Hewitt ("Hewitt"), Dr. Magdi S. Rizk ("Rizk"), and Dr. Eileen S. McGee ("McGee"). Hewitt testified first, but shortly after he began testifying, the trial court determined that Hewitt was not a licensed psychologist.[2] The trial court determined that because Hewitt was not a licensed psychologist, he was not qualified to offer an opinion regarding the sole guilt-phase issue—Awkal's sanity at the time of the crime. The trial court therefore excluded Hewitt's testimony and instructed the jury to disregard the testimony Hewitt had already provided. Rizk, a court-appointed forensic psychiatrist

---

that Awkal had access to McGee. The fact that she was inexperienced and may not have been the strongest possible expert should be considered in the context of Awkal's claim of ineffective assistance of counsel and does not indicate that the state neglected its duty under *Ake*. Accordingly, to the extent that Awkal raises a properly preserved claim of *Ake* error, this claim would not succeed on the merits.

[2]Not only was Hewitt unlicensed, but also Hewitt had received his Masters and Ph.D. from Century University in California, a mail-in university. Hewitt was, however, permitted to testify at the penalty phase.

who had originally evaluated Awkal to determine if Awkal was competent to stand trial, testified that he believed that Awkal was *sane* at the time of the crime. McGee, a licensed pediatrician who had been practicing psychiatry for about a year but who was not yet a board-certified psychiatrist, was the final expert to testify at the guilt phase.

Clearly, Awkal's counsel's selection of guilt-phase experts was far less than ideal; counsel chose one unlicensed psychologist, a new and uncertified psychiatrist, and a psychiatrist whose testimony completely undermined Awkal's sole defense. We conclude that counsel's decision to call Rizk to testify at the guilt phase constituted the deficient performance necessary to establish ineffective assistance of counsel.

The facts of Awkal's case are comparable to those of *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000). Like Awkal, Combs did not contend that he was innocent. *Id.* at 273. Instead, Combs's defense was that "he was too intoxicated from alcohol and drugs to form the requisite intent to kill the [two] women or to have committed the killings with prior calculation and design." *Id.* Combs's counsel presented testimony that Combs was intoxicated, but called only one expert witness, a psychologist who testified on cross-examination that, contrary to Combs's defense, Combs had killed intentionally. *Id.* We held that Combs received ineffective assistance of counsel because "[r]egardless of whether Combs's counsel should have known or instead actually knew [the expert's] opinion regarding Combs's intent, however, counsel's decision to put him on the stand was objectively unreasonable. . . . [N]ot only did [the expert's] testimony destroy any hope of a successful intoxication defense, but it also helped the prosecution to establish one of the elements of its case in chief. Quite simply, this testimony was completely devastating to the defense, and counsel's decision to present it was objectively unreasonable." *Id.* at 288.

There are no relevant distinctions between Awkal's and Combs's claims. Not guilty by reason of insanity was Awkal's sole defense. Like the psychologist in *Combs*, Rizk testified about Awkal's psychological background, including the fact that Rizk had earlier found Awkal incompetent to stand trial. On direct examination, Rizk fought defense counsel's questions and testified that Awkal did not experience hallucinations

at the time of the crime.  Defense counsel read an isolated portion of Rizk's sanity report dealing with Awkal's perceptions at the time of the murders, but did not ask Rizk if he thought that Awkal was insane at the time of the crime.  J.A. at 2078 (Trial Tr. Rizk Test. at 1423).  On cross-examination, Rizk unequivocally stated that Awkal was not legally insane at the time of the crime.  Rizk read a portion of his report explaining his conclusion that Awkal was not legally insane:

> [Awkal] has no past history . . . of a mental disease of psychotic proportions, period.  There is also no evidence of residual symptoms or past psychotic clauses [sic].
> At the time of the incident, which is the shooting, [Awkal] was angry and upset and had no psychotic motive for the act.  There is no history or documentation of any bizarre behavior of the defendant immediately prior to the act.  The defendant's belief that he saw a monster's face could be explained on the basis of an illusion, and between brackets, rather than on the basis of mental illness.
> At the present time the defendant is not manifesting any symptoms of psychosis.  It is my opinion that at the time of the act the defendant did not suffer from any mental disease or defect which impaired his ability to know the wrongfulness of his act.

J.A. at 2115 (Trial Tr. Rizk Test. at 1460).  Defense counsel had this report before calling Rizk, and even asked Rizk about a selected portion of it, but did not object to Rizk's reading and did not attempt to cabin its impact.  J.A. at 2065, 2078, 2115-16 (Trial Tr. Rizk Test. at 1410, 1423, 1460-61).  Instead, defense counsel repeatedly tried to coax Rizk into admitting that he believed that Awkal suffered from hallucinations or was psychotic.  *See, e.g.,* J.A. 2079-89 (Trial Tr. Rizk Test. at 1424-34).  Rizk consistently stated that no matter which medications Awkal had received and no matter what other doctors might have thought, it was his opinion that Awkal was not psychotic, did not suffer from hallucinations, and was *sane* at the time of the crime.  *See, e.g.,* J.A. at 2079, 2102, 2107-09 (Trial Tr. Rizk Test. at 1424, 1447, 1452-54).

The fact that Awkal's counsel possessed and referenced Rizk's sanity report, which stated that Awkal was sane at the time of the crime, does not change our analysis. *See* J.A. at 2078 (Trial Tr. Rizk Test. at 1423).  In *Combs*, we clearly stated that, given the fact that the expert's testimony completely eviscerated the sole defense, the decision

to put that expert on the stand was "objectively unreasonable," regardless of whether defense counsel knew or should have known the contents of that expert's opinion. *Combs*, 205 F.3d at 288. Accordingly, even though it appears that Awkal's counsel knew of Rizk's opinion on sanity, we hold that it was deficient performance for Awkal's counsel to call as a witness Rizk, whose testimony ran counter to Awkal's sole defense.

Our opinion in *Morales v. Mitchell*, 507 F.3d 916 (6th Cir. 2007), does not alter this result. Morales's defense was that, at the time of the crime, he could not "appreciate the consequences of his acts or refrain from committing those acts, or understand the difference between right and wrong." *Id.* at 921 (internal quotation marks omitted). This defense was based on a combination of Morales's psychological problems and his voluntary intoxication at the time of the crime. Morales's counsel presented the testimony of a forensic psychologist who testified that "Morales's personality disorder, combined with his alcohol dependency and abuse, deprived him of the ability to refrain from or understand the wrongfulness of his actions." *Id.* at 938. However, this expert also stated that she agreed that "voluntary intoxication does not serve as a basis for the insanity defense." *Id.* at 936. We explained that "because [the expert's] *one unhelpful comment* was improperly admitted over defense counsel's objection, we decline to hold that trial counsel provided ineffective assistance in presenting [the expert's] testimony." *Id.* at 938. In *Morales*, we distinguished *Combs* in part because "unlike Combs's counsel, Morales's trial attorney fully ascertained his expert witness's opinion before trial." *Id.*

Awkal's case is analogous to *Combs* rather than to *Morales*. Like the expert in *Combs*, Rizk's testimony completely undermined Awkal's sole defense. Rizk did testify regarding religious friction in Awkal's family and the fact that Rizk had found Awkal not competent to stand trial. Though these aspects of Rizk's testimony were not harmful to Awkal, they did not *help* his defense at the guilt phase. Under Ohio law effective at the time of Awkal's trial, "[a] person is 'not guilty by reason of insanity' . . . only if he proves . . . that at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts." Ohio Rev. Code

§ 2901.01(N).  Therefore, the sole portion of Rizk's testimony that was relevant at the guilt phase was Rizk's opinion regarding Awkal's sanity at the time of the crime.  Rizk's only relevant testimony was clearly, and completely, opposed to Awkal's sole defense.  Unlike the single, isolated comment by the expert in *Morales*, Rizk's testimony thoroughly undermined Awkal's defense and was not counterbalanced by other relevant information that could have helped Awkal.  Instead, Rizk's testimony was akin to that of the expert in *Combs*; it so devastated Awkal's sole defense that it was objectively unreasonable for Awkal's counsel to call Rizk to the stand.  The fact that Awkal's counsel knew of and had access to Rizk's reports does not change our conclusion that presenting an expert witness whose testimony plainly contradicts and utterly destroys an individual's sole defense constitutes deficient performance by counsel.

### b.  Prejudice[3]

In addition to showing that his counsel's performance was deficient, Awkal has shown that this deficiency prejudiced Awkal.  The state presented other evidence that Awkal was legally sane at the time of the crime and that Awkal acted with prior calculation.  For example, the prosecutor emphasized that Awkal had diapers and other baby supplies in his car at the time of the murders, that he was arrested with a full clip of bullets, and that he had taken steps indicating his intent to move to another area.  J.A. at 2444-50 (Trial Tr. State Closing at 1776-82).  However, Awkal countered this evidence with testimony explaining that he intended to commit suicide but that his highly emotional mental state caused him to break with reality and kill his wife and her brother without intent or knowledge of his own actions.  Just as in *Combs*, defense counsel's unreasonable decision to present Rizk's testimony "destroy[ed] any hope of a successful [insanity] defense" and "was completely devastating to the defense." *Combs*, 205 F.3d at 288; *see also id.* at 290 ("The testimony of the sole defense expert that Combs, although intoxicated, nevertheless acted with purpose and intent was

---

[3]Awkal argues that his counsel's performance was so deficient that he was constructively deprived of counsel and that we can therefore presume prejudice under *United States v. Cronic*, 466 U.S. 648 (1984); *see also Ivory v. Jackson*, 509 F.3d 284, 295 (6th Cir. 2007).  However, because we conclude that Awkal can show prejudice sufficient to satisfy the *Strickland* standard, we need not decide whether Awkal's counsel's errors were so severe as to constitute a constructive denial of counsel.

obviously damaging to the defense.  Furthermore, [the expert's] testimony provided the State with its most powerful evidence of purpose.").

Defense counsel's decision to call Rizk was so damaging to Awkal's defense that even the prosecutor openly wondered why counsel made this choice.  Before Rizk took the stand, the judge, at the prompting of the prosecutor, asked Awkal's counsel if they had "strategic reasons for calling Dr. Rizk."  J.A. at 2064-66 (Trial Tr. at 1409-11).  Defense counsel stated that he had no duty to provide such an explanation and declined to do so.  *Id.*  The prosecutor then stated, for the record, that defense counsel "have had for some time the report of Dr. Rizk concerning the sanity evaluation of [Awkal]."  *Id.* at 2065 (Trial Tr. at 1410).  Defense counsel's choice to call an expert whose report indicated that he would testify that Awkal had been legally sane was such an obviously damaging decision that even the prosecutor was concerned about it.  The state also highlighted defense counsel's damaging decision during closing argument, telling the jury that:  "Then Mr. Gill called one of our witnesses, Dr. Rizk to the stand.  I am still trying to figure that one out."  J.A. at 2457 (Trial Tr. State Closing at 1789).  The judge overruled an objection to this comment.  *Id.*  Defense counsel's own attempt to confront Rizk's testimony in his closing argument included an admission that Rizk "didn't quite agree" with defense counsel.  J.A. at 2478-79 (Trial Tr. Def. Closing at 1810-11).  Defense counsel's decision to call Rizk caused such obvious and extensive harm to Awkal's case that there is a reasonable probability that, had defense counsel not called Rizk, the jury's verdict would have been different.

The fact that the state indicated that it would have called Rizk to testify if Awkal had not done so does not change our conclusion that Awkal was prejudiced by his counsel's objectively unreasonable decision to call Rizk.  *See* J.A. at 2097, 2457 (Trial Tr. at 1442, 1789).  The error here is not that the testimony countering Awkal's not-guilty-by-reason-of-insanity defense was presented at some point during trial, but rather the fact that Awkal's *own counsel* called an expert witness whose testimony completely destroyed this defense.  It is part of the normal course of a trial for the prosecution to

oppose the defendant's position, but it is devastating for a defendant to present voluntarily evidence that completely contradicts his entire defense.

Similarly, Awkal has shown prejudice even though his counsel called an expert witness, McGee, who testified that Awkal was legally insane at the time of the crime. In the normal course of a trial, prosecution and defense experts will often disagree, and it is the jury's place to resolve any conflict. Here, however, the two defense experts presented diametrically opposed views on the critical guilt-phase issue. The jury could not seriously consider or accept Awkal's assertion that he was not guilty by reason of insanity after Awkal's own attorneys had given them a witness who unequivocally stated that this defense was not applicable to Awkal. Awkal's counsel did call an expert who supported Awkal's defense, but McGee's testimony could not undo the damage caused by defense counsel's unreasonable decision to call Rizk.

### c. Ohio Supreme Court's Application of *Strickland* to These Facts

In addition to showing that his counsel's performance was deficient and that he was prejudiced by this deficiency, Awkal has "show[n] that the [Ohio Supreme Court] applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Cone*, 535 U.S. at 699. After considering Awkal's claims of ineffective assistance of counsel, the Ohio Supreme Court concluded that "Awkal was not deprived of a fair trial by his trial counsel. Given the evidence supporting his conviction, he was not prejudiced by what occurred at trial." *Awkal*, 667 N.E.2d at 971. The Ohio Supreme Court explained its holding as follows:

> Counsel also called Dr. Rizk to testify during the guilt phase. Dr. Rizk is adequately qualified and has testified in numerous other similar circumstances. However, Dr. Rizk testified that Awkal was sane at the time of the murders. This testimony obviously damaged Awkal's affirmative defense that he was not sane when he committed the murders. Yet, portions of Dr. Rizk's testimony assisted the defense, including testimony about religion as a basis for Awkal's marital problems, his medication levels, and his hallucinations.
> Counsel concluded Awkal's affirmative defense by calling Dr. McGee, a psychiatrist. Dr. McGee was not yet board certified in psychiatry, had no experience in forensic psychiatry, and had been

practicing psychiatry for only one year. Dr. McGee testified that Awkal, as evidenced by his hallucinations involving his wife in his cell in Dayton, had broken with reality at the time of the murders. This break with reality impaired his ability to know right from wrong at the time of the murders. Although her opinion may have been diminished by her lack of certification and inexperience, Dr. McGee supported Awkal's affirmative defense.

Thus, of the three doctors called to testify for the defense, the testimony of one was stricken from the record, one gave an opinion contradicting Awkal's affirmative defense but also gave other evidence that assisted that defense, and one testified that Awkal was not mentally responsible for his acts. However, Drs. McGee and Hewitt were called to testify and did testify during the penalty phase of the trial, giving pro-defense opinions. Dr. Samy also gave a pro-defense opinion in the penalty phase.

Awkal's counsel obviously had some plan in mind. Dr. Hewitt conceivably could have been allowed to testify as an expert witness, and Dr. Rizk did make an earlier finding that Awkal was incompetent to stand trial. In hindsight it appears that Awkal may have been better served to call only Dr. McGee during the guilt phase, and call her and the other defense doctors during the penalty phase, if the trial would reach that stage. However, the end result of tactical trial decisions need not be positive in order for counsel to be considered "effective." We do not believe the record establishes that Awkal's attorneys were ineffective at trial.

*Awkal*, 667 N.E.2d at 971-72 (citation omitted).

This analysis and conclusion are objectively unreasonable applications of *Strickland* because they fail to recognize the extent of the obvious harm caused by trial counsel's decision to call Rizk. The analysis also mischaracterizes Rizk's testimony as helpful to Awkal. Though Rizk did testify regarding Awkal's family and psychiatric history, these facts were irrelevant at the guilt phase. As discussed above, the only relevant question at the guilt phase was whether Awkal was sane at the time of the crime. Ohio Rev. Code § 2901.01(N). Accordingly, anything else that Rizk said at the guilt phase was irrelevant and did not "assist" Awkal's defense. Nor did it matter that Rizk had previously found Awkal incompetent to stand trial, because that incompetency was unrelated to Awkal's mental state at the time of the crime. Rizk's relevant guilt-phase testimony obviously eviscerated Awkal's sole defense, a fact that the Ohio Supreme

Court ignored when it assumed that Rizk's testimony was simply one part of an overall strategy. Once the jury heard one of Awkal's own witnesses state that Awkal was sane at the time of the crime, no strategy could have saved his sole defense. Because the Ohio Supreme Court's application of *Strickland* was objectively unreasonable, and because we conclude that Awkal received ineffective assistance of counsel at the guilt phase of trial, we **REVERSE** the district court's judgment denying habeas relief.

### 3. Ineffective Assistance at the Penalty Phase

Awkal also argues that his counsel rendered ineffective assistance at the penalty phase. Awkal asserts that his counsel failed to provide the jury with relevant mitigating material, namely a 1985 police report documenting a psychotic episode that Awkal experienced,[4] and that his counsel failed to retain and use qualified mental-health experts. The government argues that Awkal's first claim is procedurally defaulted and that his second is waived because was not properly raised in the district court. Because we have reversed the district court's judgment on the ground that Awkal received ineffective assistance of counsel at the guilt phase, we do not decide whether his claims of ineffective assistance of counsel at the penalty phase have been properly preserved or whether they would succeed on the merits.

## C. Claims of Prosecutorial Misconduct

Awkal's final claim is that the prosecutor committed misconduct that deprived Awkal of due process of law. During guilt-phase closing argument, in reference to McGee's expert testimony, the prosecutor stated: "[McGee] comes in here and says for a brief moment that this guy hallucinated on January 7th and as a result of that he was legally insane, but he is now sane, so let him walk out that door." J.A. at 2458 (Trial Tr. State Closing 1790). The prosecutor also characterized McGee's decision to testify that Awkal was insane at the time of the crime as "one of the most irresponsible acts he had ever seen." *Id.* Awkal's counsel failed to object to these statements.

---

[4] We note that Awkal's trial counsel attempted to admit this report. The trial court concluded that the report "has little or no probative value beyond the testimony regarding that incident" that Awkal had already offered. J.A. at 2306 (Trial Tr. at 1645).

This claim is procedurally defaulted. A "question of federal law decided by a state court" is procedurally defaulted "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment. This rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citations omitted). Because Awkal's counsel failed to object to the statements in question, the Ohio Supreme Court reviewed the prosecutor's actions for plain error. *Awkal*, 667 N.E.2d at 970. The Ohio Supreme Court concluded that "[i]t was error for the prosecutor to argue that Awkal would 'walk out that door' if the jury found him not guilty by reason of insanity." *Id.* However, although the Ohio Supreme Court found that this statement was intended to "inflame the passions of the jury," it concluded that the prosecutor's arguments did not constitute plain error. *Id.* at 970-71. The district court concluded that this claim was procedurally defaulted and that the claim would fail on the merits even if it had not been defaulted. J.A. at 211-12, 283-84 (Dist. Ct. Op. at 115-16, 187-88). We have held that "Ohio's contemporaneous objection rule constitutes an adequate and independent state ground barring federal habeas review and that the application of plain error review constitutes enforcement of the rule." *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005). Accordingly, because Awkal's counsel failed to object to the prosecutor's statements at trial and because the Ohio Supreme Court applied plain-error review to this claim, the claim is procedurally defaulted.

Because we grant Awkal's petition for habeas on the ground that he received ineffective assistance of counsel at the guilt phase, we do not address whether Awkal has established the cause and prejudice necessary to excuse his procedural default of the prosecutorial-misconduct issue.[5] We do, however, note that two major errors occurred here. First, as the Ohio Supreme Court mentioned, the prosecutor's remark was legally incorrect and was intended to inflame the jury's sentiments. The prosecutor's statements provided the jury with false and misleading information regarding the effect of a not-

---

[5]The fact that Awkal does not raise an argument concerning cause and prejudice in his briefs would not preclude us from deciding whether cause and prejudice exist or from proceeding to the merits if we found that cause and prejudice existed. *Thompkins v. Berghuis*, 547 F.3d at 588-89.

guilty-by-reason-of-insanity verdict, the critical guilt-phase issue in this case. The second error occurred when Awkal's counsel failed to object to this obviously inflammatory and incorrect statement. Though we do not determine the merits of this issue, we observe that both the prosecutor and defense counsel committed serious errors which should not be repeated in this case or in others.

### III. CONCLUSION

For the reasons set out above, we **REVERSE** the district court's judgment and **REMAND** this case with instructions that the district court issue Awkal a conditional writ of habeas corpus requiring Awkal's release unless the State of Ohio commences a new trial within 180 days from the date that this judgment becomes final.

———————————

## DISSENT

———————————

RONALD LEE GILMAN, Circuit Judge, dissenting.  Because I disagree with the majority's conclusion that Awkal has satisfied the *Strickland* test for ineffective assistance of counsel, I respectfully dissent.

## I.    INEFFECTIVE ASSISTANCE AT THE GUILT PHASE

### A.    Deficiency

The majority holds that Awkal has satisfied the first *Strickland* requirement by demonstrating that his counsel's performance during the guilt phase of trial "fell below an objective standard of reasonableness." *See Strickland v. Washington*, 466 U.S. 668, 688 (1984).  By the majority's reckoning, defense counsel's presentation of Dr. Magdi Rizk "devastated Awkal's sole defense" when the doctor testified that Awkal was sane at the time of the killings. (Majority Op. at 13)  The only case cited by the majority in support of this proposition is *Combs v. Coyle*, 205 F.3d 269 (6th Cir. 2000).

I recognize that defense counsel's decision to call Dr. Rizk as a witness was questionable at best.  But I am not convinced that, when considered "in light of all the circumstances," the decision was "outside the wide range of professionally competent assistance." *See Strickland*, 466 U.S. at 690.

Although the majority purports to find "no relevant distinctions" between this case and *Combs* (Majority Op. at 11), that characterization strikes me as inaccurate.  To begin with, *Combs*'s counsel called only one expert witness to testify regarding the sole defense theory—that *Combs*'s intoxication deprived him of the ability to form an intent to kill.  *Combs*, 205 F.3d at 287-88.  The expert contradicted that theory when he testified on cross-examination that Combs had acted purposefully and intentionally.  *Id.* at 287.  Here, Awkal's counsel presented not one but *three* expert witnesses at the guilt phase of trial to testify regarding Awkal's alleged insanity.  Even though the trial court struck the testimony of the first witness, Dr. Paul Hewitt, upon learning that he was not

a licensed psychologist in Ohio, Dr. Hewitt was allowed to testify later at the penalty phase of the case.

Dr. Magdi Rizk testified next. On direct examination by defense counsel, Dr. Rizk informed the jury that that Awkal had previously been found incompetent to stand trial. He also testified about the religious friction that permeated Awkal's interactions with his wife and her brothers. Dr. Rizk's testimony on direct examination was favorable to Awkal. But, as the majority discusses in detail, Dr. Rizk contradicted the defense's insanity theory on cross-examination when he testified that, in his opinion, Awkal was sane at the time of the killings.

Finally, Dr. Eileen McGee testified. She opined that Awkal was insane at the time of the shootings and had no way of understanding that his actions were wrong. Dr. McGee was also of the opinion that Latife and Mahmoud had provoked the incident. Her testimony unambiguously supported the defense's insanity theory.

The instant case is similar to *Combs* in that one expert witness—here, Dr. Rizk—contributed testimony favorable to the defendant on direct examination, but ultimately contradicted the sole defense theory when cross-examined by the prosecution. There the similarity ends. As noted above, Awkal's attorneys called two other experts in addition to Dr. Rizk. Both of those experts squarely bolstered the insanity theory, even if the testimony of one of them—Dr. Hewitt—was ultimately stricken due to his lack of a psychologist's license in Ohio.

Another important distinction between this case and *Combs* relates to the strategic implications of defense counsel's relative awareness of their experts' likely testimony. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. Defense counsel in *Combs* did not appear to have ascertained before presenting the expert witness what that witness was actually going to say on the stand. Indeed, Combs's counsel admitted that he was "surprised" when the expert testified that Combs was able to form an intent to kill. *Combs*, 205 F.3d at 288. This court recognized on appeal in *Combs* that, "[a]lthough Combs's counsel's decision to present Dr. Fisher's

testimony may be considered a strategic one, it was a decision made without undertaking a full investigation." *Id.*

Here, however, Awkal's counsel had reviewed Dr. Rizk's sanity report prior to the trial. That report plainly stated that Awkal was sane at the time of the crime. Defense counsel's election to call Dr. Rizk notwithstanding their review of the sanity report indicates that they made a strategic decision to do so, however questionable in hindsight. One reasonable explanation is that, knowing that the prosecution was going to call Dr. Rizk anyway, Awkal's counsel opted to call him for the defense to take some of the "sting" out his adverse opinion by being able to present his favorable testimony first. Along similar lines, defense counsel may have felt that having Dr. Rizk discuss Awkal's initial lack of competency to stand trial, as well as various other mental and emotional issues, would plant a seed of doubt regarding Dr. Rizk's expected testimony that Awkal was in fact sane at the time of the killings. Whatever defense counsel's reasoning, given their knowledge of Dr. Rizk's opinion on the insanity issue, their decision to call him as a defense witness rather than waiting for him to appear as the prosecution's witness suggests that the decision was a strategic one.

The Supreme Court has cautioned that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland* 466 U.S. at 689 (internal quotation marks omitted). I do not believe that Awkal has overcome this strong presumption. He therefore cannot satisfy *Strickland*'s deficiency standard.

**B.     Prejudice**

Even assuming that Awkal has shown that his counsel was deficient, he still cannot satisfy the second part of the *Strickland* ineffective-assistance test because he has failed to show that his counsel's deficiency prejudiced him. *See id.* at 691. There is no dispute that Awkal shot his estranged wife and brother-in-law to death. His sole defense

is that he was legally insane at the time, even though the evidence overwhelmingly indicates otherwise.

Awkal was furious at Latife and her brothers after she initiated the divorce. A few weeks after the divorce proceedings started, Awkal bought a semi-automatic pistol. He called Latife and her brother Omar on both the night of the purchase and the next morning to declare that he would murder their entire family if Latife did not come back to him. A month or so later, he checked out their baby's medical files from the pediatrician's office. He also changed his address to his brother's house and wrote his brother a check for virtually all of the money in a court-frozen joint account that he maintained with Latife.

Awkal arrived at the courthouse on the morning of the killings with his pistol, copies of the baby's health records, and a variety of childcare supplies on his person. Once inside, he apparently remained calm and said little before firing at least five bullets into Latife and Mahmoud at close range. Awkal then picked up the baby and proceeded to quickly make his way towards an exit. He vowed that no one was going to take the baby away, and he did not surrender until one of the deputies shot him in the back.

In short, nothing about the killings or the time leading up to them suggests that Awkal was in the grips of psychosis. To the contrary, the record shows that he had engaged in detailed planning for the killings and their aftermath. Awkal's actions were in fact totally inconsistent with his testimony that he had intended to kill himself in front of Latife. I am accordingly convinced that there was little that *anyone* representing Awkal could have done at trial to establish that, at the time of the killings, Awkal "did not know, as a result of a severe mental disease or defect, the wrongfulness of [his] acts." *See* Ohio Rev. Code § 2901.01(A)(14) (setting the standard for a finding of not guilty by reason of insanity). The majority nevertheless concludes that the decision of Awkal's counsel to call Dr. Rizk prejudiced Awkal because it "destroyed any hope of a successful insanity defense." (Majority Op. at 14 (quoting *Combs*, 205 F.3d at 288) (internal punctuation omitted)) I would instead suggest that, in light of the overwhelming

evidence against him, Awkal never had any realistic hope of a successful insanity defense.

Assuming that my view of the evidence is a reasonable one, then Dr. Rizk's testimony cannot be said to have singlehandedly "destroyed" Awkal's insanity defense, especially where the defense also presented the testimony of Dr. McGee, herself a psychiatrist, who opined that Awkal *was* insane at the time of the murders.  The majority summarily argues that "McGee's testimony could not undo the damage cause by defense counsel's unreasonable decision to call Rizk." (Majority Op. at 15)  But this assertion, which the majority presents without any supporting caselaw, ignores the ability of the jury to weigh Dr. Rizk's testimony against that of Dr. McGee and also against the insanity-related evidence as a whole.  According to the majority's rationale, Dr. Rizk's testimony was so destructive that no amount of contrary expert testimony would have helped the defense.  This implies that even if Awkal's counsel had put up, say, *five* other experts to testify that Awkal was insane, the jury could not have looked past the one adverse opinion.  I find the majority's rationale unpersuasive.

Moreover, I do not believe that the majority has adequately accounted for the fact that the prosecution would have called Dr. Rizk to testify that Awkal was sane at the time of the offense if the defense had not done so first.  The majority  reasons that the effect of Awkal's own witness contradicting the insanity defense was inherently more prejudicial that if the same witness had done so while testifying for the prosecution.  Although I have no doubt that there is some qualitative difference between the impact of adverse testimony delivered by a defense witness and that of a witness presented by the prosecution, the majority has not demonstrated why that distinction is so profound as to render Dr. Rizk's testimony per se prejudicial under *Strickland*.  To the contrary, I believe that the inevitability of Dr. Rizk's testimony in this case compels the conclusion that the trial's outcome would have been the same regardless of which side presented him as its witness.  *See Strickland*, 466 U.S. at 694 (holding that prejudice is established by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

I thus conclude that Awkal cannot satisfy either of *Strickland*'s requirements for establishing the ineffective assistance of counsel at the guilt phase of the trial. My conclusion leads me to believe that the Ohio Supreme Court applied *Strickland* in a reasonable manner. This requires me to now address the two grounds for relief that the majority had no reason to reach in light of its holding regarding ineffective assistance at the guilt phase. Those claims are that (a) Awkal's counsel rendered ineffective assistance at the penalty phase, and (b) the prosecutor engaged in misconduct at the guilt phase of trial, thus depriving Awkal of due process.

## II.     INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE

Awkal contends that his trial counsel rendered ineffective assistance by failing to provide the trial court with a copy of a police report documenting his involuntary hospitalization in 1985 and by failing to present the testimony of competent mental health experts in support of his insanity defense at the penalty phase of the trial. The first part of this claim is procedurally defaulted and the second part lacks merit. I will address each part in turn below.

## A.     Failure to provide mitigation evidence

At the conclusion of Dr. McGee's guilt-phase testimony, Awkal's counsel attempted to admit into evidence a medical report regarding Awkal's hospitalization in 1985 following an incident at work in which he apparently had a mental breakdown and collapsed. The trial court sustained the prosecution's objection, reasoning that the document was difficult to read and lacked probative value because Dr. McGee had already testified about the episode detailed in the report. Awkal argues that his counsel's failure to obtain and introduce a copy of a *police* report relating to the 1985 incident during the penalty phase of trial constituted the ineffective assistance of counsel.

But Awkal did not raise this allegation in state court. "Before a federal court may grant habeas relief . . . , the prisoner must exhaust his remedies in state court. In other words, the state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."

*O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999); *see also* 28 U.S.C. § 2254(b)(1)(A). "[I]f an unexhausted claim would be procedurally barred under state law, that claim is procedurally defaulted for purposes of federal habeas review." *Alley v. Bell,* 307 F.3d 380, 385 (6th Cir. 2002).

Awkal did not include this claim in his state-court appeals and is now barred by the statute of limitations from presenting it on state post-conviction review. *See* Ohio Rev. Code § 2953.21(A)(2). The claim is thus procedurally defaulted. Because Awkal has made no attempt to establish cause and prejudice for his default, *see Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (noting that a petitioner can overcome procedural default by demonstrating "cause for the default and actual prejudice as a result of the alleged violation of federal law," or by demonstrating "that failure to consider the claims will result in a fundamental miscarriage of justice"), the claim is not properly before us for review. *See Williams v. Anderson*, 460 F.3d 789, 807 (6th Cir. 2006) (declining to reach the merits of the petitioner's claim where he failed to argue cause and prejudice to excuse the default).

**B.      Retaining and using qualified mental-health experts**

Defense counsel presented the testimony of three mental-health experts—Drs. Hewitt, McGee, and Samy—during the penalty phase of trial. Awkal contends that the presentation of these experts' testimony during the penalty phase, along with that of Dr. Rizk during the guilt phase, constituted ineffective assistance of counsel with regard to mitigation evidence. I disagree.

Awkal reasons that Dr. Hewitt's testimony during the penalty phase was a "mockery" because Dr. Hewitt was "discredited" at the guilt phase when the trial judge struck his testimony. The force of Awkal's argument is diluted, however, by the fact that the judge *did* allow Dr. Hewitt to testify at the penalty phase of the case. Moreover, Dr. Hewitt gave lengthy testimony at the penalty phase about Awkal's background, family, troubled marriage, and religion. He testified that Awkal's emotional state "collapsed" on the day of the murders, that the murders were "spontaneous," and that Awkal was unable to appreciate the criminality of his conduct. Dr. Hewitt also testified

that Awkal was not "competent to know right from wrong or what he was doing and that this was a spontaneous kind of thing provoked by the overall situation at the time." This testimony supported defense counsel's argument that Awkal suffered from a "mental disease or defect"—a mitigating factor under Ohio law. *See* Ohio Rev. Code § 2929.04(B)(3). Defense counsel clearly did not fall below an objective standard of reasonableness by presenting Dr. Hewitt's testimony on this mitigating factor. *See Strickland*, 466 U.S. at 688.

Awkal next argues that trial counsel "demonstrat[ed] their complete lack of preparation for the mitigation phase" by calling Dr. Rizk to testify at the guilt phase. He reasons that the presentation of Dr. Rizk at the guilt stage "destroyed any meaningful mitigation presentation because Dr. Rizk previously testified that Awkal was sane." But the standard under Ohio law for a plea of not guilty by reason of insanity differs from the standard for the mental-disease-or-defect mitigating factor provided by Ohio Revised Code § 2929.04(B)(3). *State v. VanHook*, 530 N.E.2d 883, 890 (Ohio 1988) ("We note that the mitigating factor . . . utilizes the term "substantial capacity[,]" which is a term allowing a broader range of [mental] conditions than the term "capacity" standing alone."). Awkal's argument accordingly fails because Dr. Rizk's guilt-phase testimony did not necessarily detract from the testimony of the penalty-phase experts about Awkal's mental condition.

As for the testimony of Dr. Salah Samy, another psychiatrist, Awkal submits that trial counsel completely failed to prepare Dr. Samy for his testimony. In support of this assertion, Awkal cites Dr. Samy's testimony that he could not give a loss-of-control opinion without more detailed information about Awkal. Dr. Samy did, however, testify that Awkal was not malingering and that, at the time of the shootings, Awkal had "developed [an] acute psychotic reaction." Awkal's counsel did not act unreasonably by presenting this favorable testimony.

Finally, Awkal argues that Dr. McGee "was a pediatrician, not board certified[,] and had no experience in forensic psychiatry." He accordingly reasons that defense counsel acted ineffectively by presenting such an unqualified expert to testify regarding

his mental condition. But Awkal's argument overlooks Dr. McGee's testimony that she had started her professional training in child psychiatry in 1986, had taken a law-school class on forensic psychiatry, and had worked for four months with a forensic psychiatrist in Cleveland. At the time of the trial, Dr. McGee had closed her pediatric practice, had taken the test to become board-certified in psychiatry, and was practicing psychiatric medicine. Seventy percent of her patients were adults.

Defense counsel did not act unreasonably by calling Dr. McGee. Her testimony demonstrates that she was clearly qualified to act as an expert witness on Awkal's behalf. *See Joyce-Couch v. DeSilva*, 602 N.E.2d 286, 290 (Ohio 1991) ("Under Ohio law, any doctor licensed to practice medicine is competent to testify about medical issues."). This court has held that "[a] licensed practitioner is generally held to be competent, unless counsel has good reason to believe to the contrary." *Lundgren v. Mitchell*, 440 F.3d 754, 772 (6th Cir. 2006). Awkal can make no such showing regarding Dr. McGee. Because Dr. McGee was qualified under Ohio law to give an expert opinion, and in fact gave competent testimony that Awkal was mentally ill, Awkal's counsel was not constitutionally ineffective for retaining her and presenting her testimony during the penalty phase of trial.

In sum, Awkal has failed to demonstrate that defense counsel was ineffective during the penalty phase of his trial. I will thus move on to address his final remaining claim regarding prosecutorial misconduct.

### III.   PROSECUTORIAL MISCONDUCT

During closing argument in the guilt phase of the trial, the prosecutor made the following isolated comment about Dr. McGee's testimony:

> She comes in here and says for a brief moment that this guy hallucinated
> on January 7th and as a result of that he was legally insane, but he is now
> sane, so let him walk out the door.

Awkal contends that this statement constituted prosecutorial misconduct and that, as a result, he was denied the due process of law.

The prosecutorial-misconduct claim is procedurally defaulted. Because Awkal's counsel made no contemporaneous objection to the prosecution's statement, the Ohio Supreme Court reviewed the claim under the plain-error standard. *State v. Awkal*, 667 N.E.2d 960, 970 (Ohio 1996). The Supreme Court denied the claim, explaining:

> It was error for the prosecutor to argue that Awkal would "walk out that door" if the jury found him not guilty by reason of insanity. First, this statement was an incorrect statement of the law. If Awkal were found not guilty by reason of insanity, he would have been confined to a psychiatric facility until his sanity was restored. This statement plainly sought to inflame the passions of the jury. However, the prosecutor's arguments, as a whole, although impassioned, did not deprive Awkal of a fair trial and did not constitute plain error.

*Id.* at 970-71.

Awkal subsequently raised the prosecutorial-misconduct allegation in his federal habeas petition. The district court correctly determined that the allegation was procedurally defaulted. Federal habeas review is generally precluded where a state court decides not to address a petitioner's federal claims because he has failed to meet a state procedural requirement that is independent of the federal question and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 729-730 (1991). And a state appellate court's plain-error review of a procedurally defaulted claim does not waive the procedural default. *Lundgren*, 440 F.3d at 765.

Here, the Ohio Supreme Court invoked the state's contemporaneous-objection rule, explaining that "Awkal objected to neither of these alleged errors [the claim at issue along with an unrelated prosecutorial-misconduct claim] at trial. Therefore, he has, with the exception of plain error, waived the issues." *Awkal*, 667 N.E.2d at 970. This court has held that the contemporaneous-objection rule is an adequate and independent state ground barring federal habeas review, *Biros v. Bagley*, 422 F.3d 379, 387 (6th Cir. 2005), and that plain-error review is not inconsistent with the procedural default. *Lundgren v. Mitchell*, 440 F.3d at 765. Because Awkal does not advance a cause and prejudice argument to excuse his default, the issue is not properly before us for consideration.

## IV.   CONCLUSION

I respectfully dissent from the majority's holding that Awkal has demonstrated ineffective assistance of counsel at the guilt phase of the trial.  In addition, I conclude that Awkal's claims regarding (a) ineffective assistance of counsel at the penalty phase and (b) prosecutorial misconduct at the guilt phase are either procedurally defaulted or meritless.  I would therefore affirm the judgment of the district court in denying Awkal's petition for habeas relief.